William T. **TURNER**, Appellant,

v.

**SCHERING–PLOUGH CORPORATION.**

Nos. 89–5214, 89–5534.

United States Court of Appeals, Third Circuit.

Argued Dec. 1, 1989.

Decided April 23, 1990.

Robert S. Dowd, Jr. (argued), Giordano, Halleran & Ciesla, A Professional Corp., Middletown, N.J., for appellant.

Richard C. Mariani (argued), Jerrold J. Wohlgemuth, Apruzzese, McDermott, Mastro & Murphy, Springfield, N.J., for appellee.

Before BECKER and STAPLETON, Circuit Judges, and KELLY, District Judge [*]

## OPINION OF THE COURT

STAPLETON, Circuit Judge:

Plaintiff William Turner was terminated from his job with the defendant Schering–Plough Corporation ("Schering") after 37 years of employment. He alleges that, over the course of three years, he was demoted, had his new job eliminated, and was terminated, all because of his age in violation of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. §§ 621–634, and New Jersey's Law Against Discrimination ("NJLAD"), N.J.S.A. 10:5–1 *et seq.* Turner also contends that his discharge was motivated by an intent to deprive him of pension benefits in contravention of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001

*et seq.* Finally, Turner alleges that Schering breached its contractual obligations to him under New Jersey law by discharging him without complying with implied promises it made in its employee personnel manuals.

Schering moved for summary judgment in its favor on all these claims. Initially, the district court granted summary judgment for Schering on Turner's ERISA and state law wrongful discharge claims, as well as his claims for liquidated damages under the ADEA, 29 U.S.C. § 626(b), but declined to grant summary judgment for Schering with respect to Turner's remaining claims under the ADEA and the NJLAD. Upon a motion for reconsideration, however, the district court concluded that summary judgment for Schering with respect to these remaining claims was appropriate. *Turner v. Schering–Plough Corp.*, 705 F.Supp. 1048 (D.N.J.1989). Turner filed this timely appeal.

We conclude that summary judgment for Schering was appropriate with respect to all of Turner's claims other than his claim under the ADEA and the NJLAD that age played a role in the decision to discharge him. On that claim, however, Turner is entitled to a trial.[1]

## I.

Turner was 55 years of age at the time of his termination. He started as a mail boy with Schering in June of 1948 and, except for a four-year stint in the Navy, was employed by Schering until December 1985.

During his years at Schering, Turner performed capably and steadily climbed the corporate ladder. He worked as a quality control clerk, quality control supervisor, supervisor of inspection control, manager of Schering's Midwest Distribution Center, a market research associate, product manager for cardiovascular services, and manag-

---

[*] The Honorable Robert F. Kelly, United States District Judge for the Eastern District of Pennsylvania, sitting by designation.

[1.] Turner also appealed an order by the district court awarding Schering attorneys fees in connection with a discovery matter. As Turner has not argued before us as to how the district court erred in this respect, he has waived this issue on appeal. *NLRB v. Browning–Ferris,* 691 F.2d 1117, 1125 (3d Cir.1982).

er of sales services, and also managed to complete his studies for a Bachelor's Degree in Business Administration.

In 1976, Turner reached the highest position he was destined to hold at Schering when he was selected to be Manager of Distribution Services for Schering's United States Pharmaceutical Products Division ("USPPD"). This was a grade 91 position in the Schering hierarchy which made Turner eligible for management incentive bonuses. In this position, Turner was responsible for the distribution of Schering products nationwide, the capital, labor, and logistical decision-making necessary thereto, and related functions such as customer orders, billing, and customer service. Turner supervised four to five area distribution managers, as well as Schering's Manager of Customer Service, Manager of Distribution Systems Projects, and Billing Supervisor. Overall, Turner managed between 100 and 180 employees. During his tenure, distribution services had an operating budget as high as ten million dollars, and sales of 500 to 600 million dollars.

From 1976 until September of 1982, Turner reported to Tom Grimaldi, then Vice–President for Sales of USPPD. Grimaldi is older than Turner. Throughout his years under Grimaldi, Turner consistently received performance reviews that rated his overall performance as very good. All was calm until September of 1982, when Schering altered its managerial reporting structure so that the distribution function Turner managed was transferred from the Sales and Marketing Department to the Pharmaceutical Manufacturing Department. Turner's responsibilities remained approximately the same, but he now had a new supervisor, Steven LaHood, a 35 year-old manager who had been with Schering for only two years. LaHood was not a vice-president like Grimaldi; rather he was the Director of Logistics for the Manufacturing Department.

Soon thereafter, LaHood and Turner visited several of the distribution centers under Turner's control. LaHood was displeased with what he found to be operational deficiencies such as inventory inaccuracies, management overstaffing, a poor organizational structure, and severe structural problems at the Dallas distribution center.[2] When he asked Turner about these problems, LaHood was disturbed because he felt Turner's responses reflected a lack of knowledge about important aspects of the operations under his control. LaHood informed Turner of his unhappiness and instructed him how the distribution services operations were to be managed.

That fall LaHood also visited Schering's distribution center in Maplewood, New Jersey. LaHood found a number of problems: inoperable lift trucks, broken conveyor belts, and a poor phone system. He believed these problems resulted in low morale among the employees, who found themselves without the necessities for performing their jobs. LaHood felt none of these problems had been adequately addressed by Turner or the manager of the Maplewood facility. LaHood transferred the manager to another position; thereafter the manager told LaHood he did not receive the support he needed from Turner to solve the problems at Maplewood.

LaHood's negative view of Turner's performance as Manager of Distribution Services is reflected in a series of performance evaluations. LaHood's first performance review of Turner was given orally to Turner in November 1982, and was memorialized in a memo on December 9, 1982. The memo details LaHood's own management style, sets forth standards to which the Manager of Distribution Services was to adhere, and lists the problems LaHood identified. LaHood specified how Turner needed to improve as a manager,[3] particu-

---

**2.** LaHood stated that the warehouse floor at Schering's Dallas facility had buckled up over 2½ inches. "In the office people would sit in their chair and have to put blocks behind them because they would roll into the walls." App. at 1899. LaHood claimed that the employees

there were frustrated because no one had addressed this problem.

**3.** LaHood indicated that Turner must: (1) be less emotional in dealing with issues both with his staff and others outside his organization; (2) not continue to exhibit an abrasive, emotional

larly in his relations with other employees, and stated that he would review Turner's performance periodically over the coming months and make an assessment to Turner's "potential future" as Manager of Distribution Services. App. at 622.

In February 1983, LaHood filled out a performance summary regarding Turner. In this summary LaHood indicates that Turner displayed "some very good performance relating to budgeting controls, inventory accuracy and productivity increases" [and noted] . . . some positive results in Bill's performance managing the daily business activities within the Distribution Services area." *Id.* However, LaHood again stressed the need for Turner to improve his performance in certain problem areas if he was to succeed at his level within Schering, and suggested that Turner take a "Middle Management Program," and engage in training in "Problem Solving and Decision Making", "Improved Performance", and "Assertiveness." App. at 630.

In May 1983, LaHood filled out his final review of Turner's performance as Manager of Distribution Services. LaHood rated Turner's performance as good in the following categories: (1) performance versus goals; (2) performance versus operating plan; and (3) performance versus prior year. Turner was rated as needing improvement in the areas of: (1) improvements in operations; (2) organization and planning of his own work and the work of subordinates; and (3) appraisal and development of subordinates. Turner's performance was rated unsatisfactory in these areas: (1) foresight and plans; (2) building a strong organization including key management succession; (3) leadership; (4) decisionmaking (borderline rating of needs improvement and unsatisfactory); and (5) relationships with others. Turner's overall performance rating was unsatisfactory.

This was Turner's final review because that same month LaHood recommended that Turner be replaced as Manager of Distribution Services and be offered a new position specifically created for him, Manager of Logistics Services. This was a grade 90 position in which Turner would not be eligible for management incentive bonuses and would control only ten people. LaHood's recommendation was approved and Turner was told he was being demoted on June 23, 1983. A "personal and confidential" memo by Richard Happel, Schering's Director of Personnel who reviewed the decision to demote Turner, reflects Happel's version of a conversation he had with Turner that day. The memo indicates that Turner was unhappy but unsurprised by the demotion. "Turner also said he didn't agree with the criticisms of him and still feels [redacted] is pulling the strings behind all of this." App. at 649. (Redaction in original). Turner told Happel he saw the new leadership skills LaHood advocated as negatives and that he was opposed to LaHood's style of management, but said he would give a 100% effort in his new position, and would go see a management consultant Happel suggested. But nowhere in the record does Turner dispute the specific allegations of performance deficiencies and operational problems LaHood identified in his deposition testimony and in memos related to Turner's performance.

Turner accepted the new position, which he claims LaHood said was "viable," "dynamic," and had tremendous growth potential, and assumed its duties in July of 1983. App. at 703, 518. Turner was given the responsibility for managing the transportation of Schering products from the manufacturing site to the distribution centers, as well as responsibility for managing the distribution requirements planning and logistic projects functions. LaHood avers that this was a position in which Schering could take advantage of Turner's skills in these areas while sharply reducing his responsibilities in the area in which he was weakest, personnel management. Turner was

attitude; (3) broaden his perspective in dealing with operational issues, and evaluate different plans of action for solving problems; (4) get more involved in day-to-day operations at the distribution centers as this was necessary for

Turner to "challenge [his] organization to maximize our opportunities"; and (5) take home work if needed since his job was not an "8:00 a.m. to 4:00 p.m." position. App. at 625.

replaced as Manager of Distribution Services by Rich Marino, a 38 year-old, hired by Schering less than a year earlier.

During his two years as Manager of Logistics Services, Turner's overall performance was graded as very good by LaHood. LaHood reviewed Turner's performance as good or very good in these areas relevant to personnel management: (1) leadership; (2) the organization and planning of his own work and work of subordinates; (3) the appraisal and development of subordinates; (4) achieving results through others; and (5) relationships with others. Turner received regular salary increases. A Schering Vice–President sent Turner a letter praising his performance, particularly for achieving a savings for the company of $660,000 in 1984, and telling him to "[k]eep up the good work." App. at 796. Turner claims he achieved an even bigger savings in 1985. While in this position Turner also took steps to address some of the problems LaHood identified in 1982 and 1983. He worked with a management consultant and attended in-house training programs in effective oral communication and project planning.

In 1985, the chill wind of managerial reorganization sent shivers through USPPD. Schering formed an internal management team, which included Happel, to evaluate the Division's management structure. To aid in this task the company retained a consulting firm which advocated a management theory focusing on "reporting relationships" and "functions" in an attempt to maximize the "span of control," i.e., the managing capacity, of each manager. This reorganization study eventually resulted in a major restructuring of USPPD, allegedly consistent with this theory.

Turner's position as Manager of Logistics Services was eliminated in November 1985. Schering contends that Turner's job was eliminated because the three functions that reported to Turner, transportation, distribution requirements planning, and logistics planning, each had a more direct relationship with functions in other departments. Thus, the three functions went their separate ways: the first to purchasing, the second to production planning organization, and the remaining function to manufacturing systems-planning. The functions previously entrusted to Turner were divided among three other managers in three different Schering departments: Robert Douglass, age 41; Phillip Duffy, also age 41; and Robert Beck, age 38.

Although 3,000 employees were affected by the reorganization, Turner, despite his long years of service and very good performance as Manager of Logistics Services, was one of only 15 employees terminated company-wide after the shake-up. Though Happel and LaHood each claims to have considered where Turner might be placed within the company, the only position open for which Happel thought Turner was qualified by training and experience was that of a grade 87 packaging supervisor. LaHood claims he did not offer this job to Turner because he did not believe Turner would perform well in that position since it required direct control over 30 to 40 hourly employees, and Turner had displayed weakness in personnel management and employee relations when he was Manager of Distribution Services. Turner was not offered his old job, renamed Manager–Distribution Centers, which was filled instead by John Sideck, a man in his 30's.

Losing his job with Schering meant that Turner was eligible for only 53.1% of the Schering pension plan benefits he would have been entitled to had he worked for 2½ more years with Schering, since he would have then had 40 years of service and would have been entitled to retire with 100% benefits at age 60. Schering was aware of the effect this discharge had on Turner's pension benefits.

## II.

The standard of review of a district court's entry of summary judgment is plenary. Summary judgment is only appropriate when, after considering the record evidence in the light most favorable to the nonmoving party, no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law.

*White v. Westinghouse Elec. Co.,* 862 F.2d 56, 59 (3d Cir.1988). "Summary judgment will not lie if the dispute about a material fact is 'genuine', that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Williams v. Borough of West Chester,* 891 F.2d 458, 460 (3d Cir.1989) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986)). However, when the record is such that it would not support a rational finding that an essential element of the nonmoving party's claim or defense exists, summary judgment must be entered for the moving party. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986).

### III.

We turn first to Turner's claims under the ADEA and the NJLAD.[4] Since the New Jersey act utilizes the same analytical framework as is applicable under the ADEA, *see Shaner v. Horizon Bancorp.,* 116 N.J. 433, 561 A.2d 1130 (1989); *Goodman v. London Metals Exchange, Inc.,* 86 N.J. 19, 429 A.2d 341 (1981), we will discuss the federal and state claims together.

The evidentiary burdens under each statute are reflected in the burden shifting approach set forth by the Supreme Court in Title VII cases:

First, the plaintiff has the burden of proving by a preponderance of the evidence a prima facie case of discrimination. Second, if the plaintiff succeeds in proving the prima facie case, the burden shifts to the defendant to articulate some legitimate nondiscriminatory reason for the employee's rejection. Third, should the defendant carry this burden, the plaintiff must then have the opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination.

*Texas Dept. of Community Affairs v. Burdine,* 450 U.S. 248, 252–53, 101 S.Ct.

---

4. As a preliminary matter, we note that Turner argues that three orders of the district court prevented him from obtaining discovery he needed to adequately oppose Schering's motion for summary judgment and, therefore, we must reverse the district court even if summary judgment would have been appropriate on the present record. Specifically, he alleges that the district court abused its discretion by failing to reopen the discovery period set forth in a scheduling order entered under Rule 16 of the Federal Rules of Civil Procedure to allow him to obtain certain documentary evidence, even though the order clearly specified that extensions of the discovery deadline had to be sought 30 days before the deadline.

We find no abuse of discretion. The first order Turner challenges was allegedly given over the telephone by a magistrate and was never entered in the record in written or tape recorded form. The district court did not err by refusing to review such an "order." *See* Advisory Committee Note to Fed.R.Civ.P. 72(a). The third order may not be reviewed on appeal as it was entered by a magistrate and Turner took no appeal to the district court. *See United Steelworkers of Amer., AFL–CIO v. New Jersey Zinc,* 828 F.2d 1001, 1004–08 (3d Cir.1987); *Siers v. Morrash,* 700 F.2d 113, 116 (3d Cir.1983). The second order complained of was also rendered by a magistrate. However, it was appealed to the district court, which concluded that the magistrate's determination that the discovery period should not be reopened was not

clearly erroneous or contrary to law. Putting aside the question of whether we may review Turner's argument that summary judgment was inappropriate because of this denial of discovery when Turner failed to file an affidavit under Rule 56(f) with the district court, *see Dowling v. City of Philadelphia,* 855 F.2d 136 (3d Cir.1988) (ordinarily the filing of an affidavit is necessary to preserve this argument for appeal), the record before us clearly demonstrates that no abuse of discretion has been committed. "[W]e will not upset a district court's conduct of discovery procedures absent a demonstration that the court's action made it impossible to obtain crucial evidence, and implicit in such a showing is proof that more diligent discovery was impossible." *In re Fine Paper Antitrust Litigation,* 685 F.2d 810, 818 (3d Cir.1982), *cert. denied,* 459 U.S. 1156, 103 S.Ct. 801, 74 L.Ed.2d 1003 (1983) (quotation omitted).

Here, Turner has only shown that the counsel he retained after the discovery deadline expired desires to discover documents that could have been discovered by his prior counsel during the nearly year long period in which discovery in this case was open. This does not come close to a showing requisite to persuade us that an abuse of discretion was committed. Rule 16 "scheduling orders are at the heart of case management," and if they can be flouted every time counsel determines she made a tactical error in limiting discovery "their utility will be severely impaired." *Koplove v. Ford Motor Co.,* 795 F.2d 15, 18 (3d Cir.1986).

1089, 1093–94, 67 L.Ed.2d 207 (1981). This court has adopted the *Burdine* approach for use under the ADEA. *See, e.g., Chipollini v. Spencer Gifts, Inc.,* 814 F.2d 893, 897–98 (3d Cir.) (in banc), *cert. dismissed,* 483 U.S. 1052, 108 S.Ct. 26, 97 L.Ed.2d 815 (1987).

To make out a prima facie case, a discharged employee in an age discrimination case must show: (1) that he belongs to the protected class, i.e., is older than forty; (2) was qualified by training and experience for the job from which he was discharged; and (3) was replaced by a person sufficiently younger to permit an inference of age discrimination. *Sorba v. Pennsylvania Drilling Co.,* 821 F.2d 200, 202 (3d Cir. 1987), *cert. denied,* 484 U.S. 1019, 108 S.Ct. 730, 98 L.Ed.2d 679 (1988). Where the discharged employee's job is eliminated and he is, therefore, not replaced, the employee need only show that he was laid off from a job for which he was qualified while other workers not in the protected class were retained. *Healy v. New York Life Ins. Co.,* 860 F.2d 1209, 1214 n. 1 (3d Cir.1988), *cert. denied,* —— U.S. ——, 109 S.Ct. 2449, 104 L.Ed.2d 1004 (1989). Once the employee makes this showing, his employer must proffer a legitimate nondiscriminatory reason for discharging him. If the employer meets this burden, the burden of production shifts back to the employee to show that the defendants' stated reasons were mere pretext and not worthy of credence. At all times, the employee retains the burden of persuading the trier of fact that age was a determinative factor in the defendant's decision to take an adverse employment action against him. *White,* 862 F.2d at 59–60. "Age need not be the sole factor, but it must have made 'a difference in the [employer's] decision.'" *Lockhart v. Westinghouse Credit Corp.,* 879 F.2d 43, 48 (3d Cir.1989) (quoting *Chipollini v. Spencer Gifts Inc.,* 814 F.2d at 897).

An employee may defeat summary judgment by producing "evidence of inconsistencies and implausibilities in the employer's proffered reasons for discharge [which] reasonably *could* support an inference that the employer did not act for nondiscriminatory reasons...." *Chipollini,* 814 F.2d at

900. In this situation, the inquiry of the reviewing court is focused; if the record contains evidence supportive of a rational inference that the employer's reasons are "unworthy of credence," summary judgment for the employer is improper. *Sorba,* 821 F.2d at 203.

## IV.

■ The district court found, and the defendants do not contest, that Turner made out a prima facie case. He was a member of the protected class at all relevant times and he was qualified by training and experience for the position from which he was demoted, the position from which he was terminated, and for the packaging supervisor position left open after the reorganization. In the case of his demotion, Turner was replaced by Richard Marino, then age 38, who was sufficiently younger to give rise to an inference of discrimination. With respect to the reorganization, there is evidence that more junior employees, such as the three managers, ages 38 to 41, who took over the supervisorial responsibilities Turner held as Manager of Logistics Services, were treated more favorably. Turner thus met his initial burden.

The district court also found, and Turner does not contest, that Schering proffered evidence of a legitimate nondiscriminatory reason for each of the actions it took with respect to Turner. The affidavit and deposition testimony of LaHood, as well as his performance reviews of Turner, indicate that Turner was demoted for performance deficiency. Schering further contends that Turner's job as Manager of Logistics Services was eliminated because the three functions that reported to him were more logically related to functions in other departments. As for the company's decision not to offer Turner another position, LaHood and Happel averred that they looked for spots for Turner and found only one for which he was qualified, packaging supervisor. Since this position required the holder to supervise 30 to 40 hourly workers, they did not believe Turner would be a good choice because he performed inadequately

in the area of employee relations while Manager of Distribution Services.

Our consideration of whether the district court erred in granting summary judgment comes down to the question of whether Turner has produced sufficient evidence from which a rational factfinder could conclude Schering's asserted reasons for its actions are unworthy of credence. A separate analysis is required with respect to each of the three decisions that Turner challenges: (1) his demotion;[5] (2) the elimination of his position as Manager of Logistics Services; and (3) the failure of Schering to offer him another job.

### A.

Turner relies almost exclusively on the existence of favorable reviews of his performances as Manager of Distribution Services to show the pretextual nature of Schering's decision to demote him. There is no denying the highly favorable impression of Turner's abilities these reviews reflect. Over the years, Grimaldi at various times indicated that Turner met all his goals in "an outstanding manner," App. at 747, and made "many significant contributions to the overall operation of Schering Distribution Services." In his last evaluation of Turner, completed March 1, 1982, Grimaldi said "Turner fulfilled all of his job responsibilities in … a most desirable manner," and there was "little opportunity to provide him with further guidance on how his operation might be improved". App. at 766. From 1976 to 1982 Turner was generally graded as good or better in several areas relevant to personnel management: (1) employee selection and development; (2) building a strong organization; (3) relationships with others; (4) leadership; and (5) organizing his own work and the work of subordinates.

But not everything in these reviews is favorable. In 1979, Grimaldi stated that "there has to be an improvement in [Turner's] patience and tolerance when he first faces adverse situations," and that "there must be a reduction in the level of irritation." App. at 752, 753. He recommended that Turner attend a course in the art of negotiating. In 1981, Grimaldi said Turner must improve in his relationships with others and should take a course in interpersonal relations.

As we have seen, LaHood's view of Turner's performance in the very same job was not nearly as favorable as Grimaldi's. LaHood identified serious problems at the Dallas and Maplewood Distribution Centers that Turner had not adequately addressed. LaHood found Turner lacking in the ability to evaluate alternatives, unaware of key aspects of the operations under his command, and deficient in leadership and interpersonal skills. Yet he rated Turner's performances as good with respect to performance versus goals, performance versus operating plan, and performance versus prior year. Indeed, on March 31, 1983, LaHood noted "some very good performance relating to budget controls, inventory accuracy, and productivity increases." App. at 629.

Turner argues that the close proximity between the last very positive Grimaldi evaluation and LaHood's very negative evaluation of Turner's performance as Manager of Distribution Services raises a material issue of fact as to whether per-

---

**5.** The record is somewhat opaque as to whether Turner is contending that his demotion, in and of itself, is a separate violation of the ADEA and NJLAD or rather that the circumstances surrounding his demotion are relevant to showing that the elimination of his job and subsequent termination in 1985 were acts of age discrimination. At oral argument, Turner's counsel appeared to concede that he was not pressing the demotion as a separate claim because no timely charges were filed with the EEOC. Furthermore, a reading of the pre-trial order filed by the parties below indicates that the relevant age discrimination issue for trial was whether age discrimination was a determinative factor in the elimination of Turner's job and his subsequent firing, not whether his demotion was motivated by age discrimination.

Nevertheless, the parties have devoted much of their efforts on appeal trying to convince us either that there exists or does not exist a material issue of fact with respect to whether Turner's demotion was motivated by age discrimination. Given this, and that the circumstances of his demotion are relevant to determining whether his termination was the result of age discrimination, we have analyzed this issue as if the demotion was a basis for recovery in itself.

formance was really the reason for Turner's demotion. We disagree.

It was LaHood who had responsibility for the success of the unit in which Turner worked at the time of the demotion decision and it was LaHood who, subject to review, made that decision. Accordingly, the relevant question is whether there is any reason to believe that LaHood did not make the demotion decision for the reasons he now tenders—what he saw as the serious and unattended problems at the Dallas and Maplewood Centers, and Turner's ignorance of some of the key operations under his control and deficiencies in employee relations.

This record will not support an inference that the tendered reasons were pretext for age discrimination. Turner has offered no evidence tending to show that serious and unattended problems did not exist within his jurisdiction or that LaHood's other criticisms at the time of the demotion decision were unjustified. Turner's affidavit reflects no more than that he did not like LaHood's management philosophy and that he believes LaHood demoted him because of his age. In the context of the specific, substantial, and undisputed performance deficiencies contemporaneously documented by LaHood as he made his evaluations of Turner, the Grimaldi performance reviews are not sufficient to create a material dispute of fact concerning LaHood's sincerity. Indeed, the most significant thing about Grimaldi's reviews is that they tend to confirm some of the problems identified by LaHood. Beyond this they demonstrate only that Grimaldi had a higher opinion of Turner's overall value to the company than did LaHood. In the context of the specific evidence of performance difficulties we have noted, this is not enough to preclude summary judgment. *Healy*, 860 F.2d at 1220 (employee "must introduce evidence that casts doubt on his employer's contention that there was a legitimate business justification for letting him go").

### B.

Turner's second allegation is that his age played a role in the decision to eliminate the position of Manager of Logistics Services which he held at the time of the reorganization. Turner's evidence is deficient here as well. In attempting to show that Schering's efficiency-based reasons for eliminating this position were unworthy of credence, Turner points to a bewildering array of factors, none of which addresses the reasons Schering says caused it to eliminate this position. The rationale Schering offers for its decision to eliminate his position is wholly consistent with the philosophy underlying its massive reorganization—reordering managerial reporting relationships according to function. Turner has produced no evidence that the reporting relationships created by the elimination of his position are in any way inconsistent with the rationale of the reorganization. *Healy*, 860 F.2d at 1220.

Rather, Turner asserts that the reorganization did not focus solely on "reporting relationships" and "functions" since Schering knew who held the affected positions and some of the few Schering managers who lost their jobs after the reorganization were selected for termination because of poor performance. But Schering does not deny it knew who its managers were; it merely asserts that it reorganized its managerial structure without regard to who the incumbents were. The mere fact that Schering knew who held affected positions does not cast doubt on its claim as to how its reorganization was carried out; indeed, it would be more surprising if Schering had been unaware of who held its management positions. Moreover, that Schering may have determined who to keep, transfer, or terminate after the shuffle by considering performance does not aid Turner in showing that the reason tendered for the elimination of his position was pretext.

Turner also points to an interrogatory answer in which Schering admits that Turner's age was discussed at three meetings in October and November of 1985. Given that Turner's functions were divided among three much younger men, Turner claims this is probative of the pretextual

nature of Schering's reason for eliminating his job. He says it is especially unbelievable that his job post could become expendable only two years and some months after Happel and LaHood had assured him it was a viable position with growth potential.

The referenced interrogatory answer states, *inter alia,* that Turner's age was discussed at three meetings, that Schering's legal counsel was in attendance at each, and that the substance of the conversation at each of the meetings is protected by the attorney-client and attorney work-product privileges. In this context, the fact that Turner's age was mentioned at three meetings does not support the inference of pretext that he seeks to draw.

We also do not find probative of pretext the fact that LaHood told Turner his new position was viable two years prior to a company-wide reorganization affecting over 3000 jobs; there is simply no evidence that this reorganization was a massive subterfuge for age discrimination against Turner. In short, Turner's failure to provide a jury with any rational basis from which to conclude that Schering's reasons for eliminating his position were unworthy of credence is a fatal deficiency which sustains the grant of summary judgment for Schering on this claim.

### C.

We reach a different conclusion concerning Schering's decision to terminate Turner rather than offer him a new position. Schering, through its personnel director Richard Happel, asserts that Turner was qualified for only one position open after the reorganization, that of a packaging supervisor. However, Schering allegedly felt Turner's poor performance as Manager of Distribution Services made him a bad choice for this job since it required direct supervision of 30 to 40 workers.

While Schering's explanation is plausible, on this record we believe it is one about which reasonable minds could differ. A rational jury could find this reason for not offering Turner the job pretextual in light of Turner's markedly improved performance while working as Manager of Logistics Services. While in this position, Turner took steps to address the problems in his performance LaHood had identified by attending in-house courses in effective oral communication and project planning. That these efforts at self-improvement bore fruit is witnessed by the testimony of LaHood himself. He rated Turner's performance as good or very good in leadership, achieving results through others, appraisal and development of subordinates, and relationships with others. In short, as Manager of Logistics Services Turner met or exceeded Schering's expectations in those very areas in which he had been deemed deficient as Manager of Distribution Services.

Turner's performance was not just strong in these areas, however. In early 1985, Turner was praised by a Schering Vice–President for his overall performance, particularly for achieving a savings for the company of $660,000 in 1984, and told to "[k]eep up the good work." App. at 796. Turner's Logistics Services group won praise for their excellent performance in 1984 and Turner consistently was rated as very good in the category of performance versus goals. Moreover, this high level of performance was achieved in a position *three levels above* the level of a packaging supervisor. While it is true that a packaging supervisor has direct supervision over a substantial number of employees, we believe a jury should be able to evaluate this aspect of the job in light of the fact that the packaging job required supervising only a fourth of the employees the Manager of Distribution Services supervised as well as the fact that the overall responsibilities of a packaging supervisor were not nearly as extensive as those of the Manager of Distribution Services.

In short, we believe a rational jury could conclude that given Turner's extensive experience with the company in responsible positions, his dedication to his career, and

his marked improvement in performance over the preceding two and one-half years, Schering's alleged reason for not offering him the Packaging Supervisor job is pretextual. A reasonable jury could conclude that he would have been made a packaging supervisor but for his age. As a result, he is entitled to a trial on this claim.

### D.

Before leaving the ADEA, we must consider Turner's claim that Schering willfully violated the ADEA, therefore triggering liability for liquidated damages. *See* 29 U.S.C. § 626(b). Having found no triable issue of fact under the ADEA, the district court naturally also granted summary judgment against Turner on this claim. To determine whether summary judgment on this claim was appropriate, we must decide whether Turner pointed to record evidence from which a rational jury could conclude that Schering's decision to terminate him was outrageous or otherwise so reprehensible that the deterrence and punitive functions of liquidated damages are warranted. *Dreyer v. Arco Chemical Co, Div. of Atl. Richfield*, 801 F.2d 651, 658–59 (3d Cir. 1986); *see also Bartek v. Urban Redevelopment Auth. of Pittsburgh*, 882 F.2d 739 (3d Cir.1989). The evidence necessary to support such a finding must go beyond that necessary to show that Schering intentionally discriminated against Turner because of his age; rather, there must be "some additional evidence of outrageous conduct" that distinguishes this from the ordinary, though still reprehensible, case of age discrimination. *Id.*

In *Dreyer*, we noted that the availability of liquidated damages was dependent upon case-specific factors and suggested that " 'the trier of fact can properly consider [*inter alia*] the character of the defendant's act, [and] the nature and extent of the harm to the plaintiff that the defendant caused or intended to cause' " in determining whether an award was appropriate. *Id.* at 658 (quoting Restatement (Second) of Torts § 908(2)); *see also Lockhart*, 879

F.2d at 57–58. Though we disclaimed any intention of detailing those situations in which a trier of fact would be warranted in finding willfulness, we did say:

> In some cases, evidence that the employer had previously violated the ADEA might warrant imposition of liquidated damages to effectuate the deterrent purpose underlying the willfulness provision. In other cases, termination of an employee at a time that would deprive him or her of an imminent pension might show the "outrageousness" of conduct that would warrant double damages.

*Id.*

Turner attempts to show that this case falls within the two examples set forth in *Dreyer* by pointing out that Schering has violated the ADEA before and that his termination diminished his pension benefits. However, even taken together, these two facets of the record do not provide a sufficient basis under the *Dreyer* standard for an award of liquidated damages.

■ The previous violation of the ADEA by Schering involved a different division from the one in which Turner was employed, and none of the Schering employees who participated in the decision to terminate Turner played a role in the *Anastasio* case. *See Anastasio v. Schering Corp.*, 838 F.2d 701 (3d Cir.1988). There is no evidence that Schering failed to take remedial or prophylactic measures that may have been appropriate as a result of the situation reflected in *Anastasio*. A previous violation, without any aggravating factors, could not be enough to warrant an award for punitive damages or a company's second violation would always warrant a punitive damage award. We find no support for such a rule in either the statute or the case law.

■ The possibility that Turner may prove that he lost some pension benefits as a result of Schering's decision to terminate him is also not enough to require trial on his claim for liquidated damages. At the time of Turner's termination, his right to a

Schering pension had already vested; thus, the financial effect of Schering's actions was not to deprive Turner of his pension, but only to reduce the size of the pension he would otherwise have received. If an award of liquidated damages were available every time evidence is presented to show a diminution in a plaintiff's pension benefits as a result of a firing, the admittedly wavering line between ordinary cases of age discrimination and outrageous cases warranting liquidated damages awards would be wholly obliterated.[6]

## V.

■ "Section 510 of ERISA prohibits employer conduct taken against an employee who participates in a pension benefit plan for 'the purpose of interfering with the attainment of any right to which such participant may become entitled under the plan.'" *Gavalik v. Continental Can Co.*, 812 F.2d 834, 851 (3d Cir.) (quoting, 29 U.S.C. § 1140 (1982)), *cert. denied*, 484 U.S. 979, 108 S.Ct. 495, 98 L.Ed.2d 492 (1987). To recover under § 510 the employee must show that the employer made a conscious decision to interfere with the employee's attainment of pension eligibility or greater benefits. *Id.* at 852–53. A discharged employee need only show that the desire to reduce Turner's pension benefits was a "determinative factor" in its decision to terminate him. *Id.* at 860. The employee may show this by circumstantial evidence.

■ In *Gavalik*, we held that the allocation of the burdens of production and persuasion utilized in Title VII and ADEA cases is equally appropriate for cases brought under § 510. The employee has the burden of tendering evidence that constitutes a "prima facie" case. If such evidence is tendered, the employer has the burden of articulating a permissible reason for the adverse personnel action. Once there has been such an articulation, the employee has the burden of persuasion on the issue of whether an intent to interfere with rights secured under ERISA played a determinative role in the decision to take that action.

■ The concept of a "prima facie" case is thus intended to measure how much the plaintiff must show before the employer will be forced to assume the burden of an active defense. Since information concerning the employer's motivation is normally not readily available to the employee, this threshold requirement is not a stringent one. All that the plaintiff must show is that he (1) belongs to the protected class, (2) was qualified for the position involved, and (3) was discharged or denied employment under circumstances that provide some basis for believing that the prohibited intent was present. *Dister v. Continental Group Inc.*, 859 F.2d 1108, 1115 (2d Cir. 1988). When the plaintiff has thus ruled out the most common permissible reason (i.e., lack of qualifications) for the adverse action and has shown some cause for concern that protected interests have been infringed, the employer may justifiably be called upon to account.

■ Turner, as a potential recipient of a pension, was in the protected class and we have previously found that he was qualified by training and experience to be a packaging supervisor. The problem is that the evidence he has tendered concerning the circumstances of his termination make the likelihood of pension-based animus no greater in this case than in every case in which an employee is discharged by an employer with an ERISA plan.

---

**6.** Turner also insists that Schering engaged in outrageous conduct when it threatened him with a cut-off of health benefits if he did not refrain from filing this suit even though it knew his wife was hospitalized at the time. However, this allegation is based upon a letter from counsel for Schering that we conclude cannot reasonably be given the interpretation for which Turner contends. Schering did not threaten to cut-off Turner's benefits unless he dropped his lawsuit. On the contrary, the record indisputedly indicates that Schering provided Turner with 60 weeks of severance with the option of continuing his health coverage for that period of time.

As we have noted, Turner's discharge did not deprive him of his pension. All Turner has shown is that his termination deprived him of the opportunity to accrue additional benefits through more years of employment. This kind of deprivation occurs whenever an ERISA employer discharges an employee and is not alone probative of an intent to interfere with pension rights. Where this is the only deprivation, a prima facie case requires some additional evidence suggesting that pension interference might have been a motivating factor. In this connection, we note that the record contains no evidence that the savings to the employer resulting from Turner's termination were of sufficient size that they may be realistically viewed as a motivating factor. Indeed, there is no evidence at all about the economic consequences to Schering that flowed from Turner's termination.[7]

The situation before us is like that before the Court of Appeals for the Fifth Circuit in *Clark v. Resistoflex Co.*, 854 F.2d 762 (1988). We agree with its conclusion:

> [I]t is undisputed that no benefits previously earned by [the employee] will be forfeited by reason of his discharge.... [W]here the only evidence that an employer specifically intended to violate ERISA is the employee's lost opportunity to accrue additional benefits, the employee has not put forth evidence sufficient to separate that intent from the myriad of other possible reasons for which an employer might have discharged him. Accordingly, the district court properly dismissed [the employee's] ERISA claim by summary judgment.

*Id.* at 771.

Because the circumstances of Turner's discharge provide no reason to suspect that Schering was concerned about the effect of that discharge on his pension rights, we hold that Turner failed to present a *prima facie* case and that summary judgment was properly granted to Schering on this claim.

## VI.

The district court also granted summary judgment to Schering on Turner's claim that its personnel policies created a contractual obligation to offer available positions to qualified Schering employees before looking outside the company. The district court read the portions of Schering's manual by Turner and determined that no jury could reasonably infer that they created a promise of continued employment in favor of Turner. We agree.

## VII.

For the reasons stated we will affirm the grant of summary judgment to Schering on all of Turner's claims other than his claims that his termination violated the ADEA and the NJLAD. We will remand for further proceedings on Turner's ADEA and NJLAD claims concerning his termination. Each party will bear its own costs.

---

7. We do not rule out the possibility that an employee with a vested pension can establish a *prima facie* case by showing a pension reduction of such size that it might reasonably be considered to have motivated the discharge. This is not such a case.