**26**

Gwendolyn CUFF

v.

INTERNATIONAL BUSINESS
MACHINE CO.

Civ. A. No. 92–0936.

United States District Court,
E.D. Pennsylvania.

Jan. 24, 1994.

Patrick M. McHugh, Philadelphia, PA, for plaintiff.

Deborah J. Krabbendam, John H. McKeon, Jr., Conrad, O'Brien, Gellman & Rohn, P.C., Philadelphia, PA, for defendant.

*MEMORANDUM*

O'NEILL, District Judge.

I. Introduction

Plaintiff Gwendolyn Cuff alleges that she was discharged by defendant International Business Machine Company ("IBM") for the purpose of depriving her of IBM employee benefits in violation of section 510 of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1140.

A bench trial was held. This Memorandum constitutes my findings of fact and conclusions of law pursuant to Fed.R.Civ.P. Rule 52(a). For the reasons that follow, I conclude that plaintiff has not shown that defendant terminated plaintiff's employment in order to deprive her of employee benefits in violation of section 510 of ERISA. Accordingly, I will enter judgment in favor of defendant and against plaintiff.

II. Findings of Fact

A. Background

1. Defendant IBM is a corporation involved in the computer business. During the period relevant to this dispute, it operated a customer service center and other facilities in Philadelphia, Pennsylvania.

2. Plaintiff was employed by defendant at its Philadelphia office from June 24, 1974, until February 14, 1990.

3. IBM provides to its employees a number of benefit programs, including its Sickness and Accident Income Plan ("S & A Plan") and its Medical Disability Income Plan. As an IBM employee, plaintiff was eligible for defendant's benefit programs.

4. Under the S & A Plan, an employee who misses work due to illness or injury is eligible for regular salary for each day of absence up to a maximum of 52 weeks in 24 consecutive months. In order to receive benefits under the S & A Plan, an employee must, upon request, submit a certificate of disability from his or her physician.

5. Under the Medical Disability Income Plan, an employee who becomes disabled after five or more years of service is eligible

---

for income until age 65.[1] In order to receive benefits under the Medical Disability Income Plan, an employee must offer satisfactory proof that the person suffers from a disability that prevents him or her from working. The disability must have existed for at least nine months and be the type of condition that will continue during the employee's lifetime. IBM may require a physical examination to determine the continuance of the disability.

6. At IBM, employment is at will and can be terminated at any time. IBM's attendance policy requires employees to report to work each day as scheduled. According to the IBM employment handbook, an employee who fails to comply with the company's attendance requirements may be dismissed.

7. IBM's medical department determines whether an employee's absence is medically justified. As part of its determination, the department evaluates information received from employees'· doctors. In situations in which the medical diagnosis needs clarification, the medical department has a medical consultant conduct an independent evaluation. The consultant's assessment generally prevails over that of the employee's doctor.

8. If the medical department finds a medical justification for the employee's absence, it will notify management that the absence is appropriate. If the medical department finds that the absence is not medically justified, it will notify management accordingly and management will handle the situation as if no medical issue is involved.

B. Plaintiff's Employment History

9. During the course of her employment, Ms. Cuff received a number of promotions. From 1987 until her termination in 1990, she held the position of senior customer center administrator.

10. Ms. Cuff testified that in May 1988, she began to experience mental and physical problems including fatigue, weakness and an inability to concentrate. Her treating physician was Dr. Stanley Lane, who had a specialized practice in allergy and immunology.

11. Plaintiff's condition did not improve. In September 1988, Ms. Cuff informed her supervisor, Ms. Donna Jennings, that she was ill. Plaintiff missed work from September 20 to September 23, 1988, and from September 29, 1988 to January 2, 1989. During this time, she was hospitalized for four days in November.

12. Ms. Cuff received her full salary while absent.

13. Pursuant to company policy, Ms. Jennings notified IBM's medical department of plaintiff's absence.

14. Dr. Lane diagnosed plaintiff as having chronic Epstein–Barr Virus.[2] He also submitted a medical certificate to IBM's medical department identifying Epstein–Barr Virus as Ms. Cuff's illness.

15. Dr. Lane sent Ms. Cuff to Dr. Lawrence Frenkel, who was director of the division of immunology, allergy and infectious diseases at the Robert Wood Johnson Medical School. In December 1988, Dr. Frenkel performed a detailed examination of Ms. Cuff. In a letter to Dr. Lane, Dr. Frenkel stated that a "review of [plaintiff's] systems except for ... sinus problems and lethargy is essentially unremarkable ... the physical exam today is essentially unremarkable." [3]

16. Ms. Cuff returned to work in early January 1989. In a letter to Dr. Silverberg dated January 6, 1989, Dr. Lane stated that Ms. Cuff had "recovered from her outbreak of EBV problems" and that she "has had an extensive immunologic work-up done, which, thus far, has shown normal results." Dr. Lane also advised against plaintiff perform-

---

1. The plan provides to an eligible employee 75 percent of regular monthly compensation for 18 months then a minimum of 40 percent until age 65. At age 65, IBM's Retirement Plan provides income for life and other retirement benefits.

2. In this Memorandum, I use the terms Chronic Epstein–Barr Virus and chronic fatigue syndrome interchangeably.

3. On December 22, 1988, Dr. Thomas Silverberg, an IBM physician, contacted Dr. Frenkel, who stated that he was "virtually convinced that Ms. Cuff has no serious physical disease."

ing any heavy manual labor or working overtime.

17. On January 9, 1989, Dr. Timothy Tomasi, an IBM physician specialist, signed off on plaintiff's return-to-work slip. He did not evaluate Ms. Cuff before signing the slip. As discussed below, Dr. Tomasi was the primary IBM physician responsible for evaluating Ms. Cuff's health as it related to her employment.

18. During the first five months of 1989, plaintiff missed only one full day and two half days due to illness.

19. On June 13, 1989, Ms. Cuff reported that she was ill and left work early. She was absent from work for the rest of June, with the exception of three days: June 19, 21 and 26.

20. On June 26, 1989, Ms. Jennings contacted Dr. Timothy Tomasi because Ms. Cuff had been out and it was unclear when she would return.

21. After receiving Ms. Jennings' call, Dr. Tomasi called Dr. Lane on June 26, 1989. Dr. Lane told Dr. Tomasi his diagnosis was "Chronic Fatigue Syndrome, Chronic Epstein–Barr Virus." Dr. Lane was not sure when plaintiff would be able to return to work. Dr. Tomasi also testified that he was told by Dr. Lane that plaintiff was "looking for long-term disability." [4]

22. Ms. Cuff's indeterminate absence and medical history prompted Dr. Tomasi and Dr. Eugene Sherman, who replaced Dr. Silverberg as the director of IBM's northeast area medical department, to require plaintiff to undergo an independent medical consultation.

23. When evaluating employee disability claims, IBM often requires an employee to provide "objective medical information." Dr. Tomasi testified that "objective medical information" consists of "repeatable and measurable kinds of evaluations and observations on the physical exam." He contrasted objective information with "subjective information," which is "information that a patient reports to the doctor."

24. Dr. Tomasi testified that IBM's medical department seeks objective medical information because "it helps us establish that there indeed is a medical disability."

25. Dr. Tomasi scheduled an appointment for Ms. Cuff with Dr. Lawrence Spitz, an internist who specialized in infectious diseases. Dr. Tomasi sent Dr. Spitz the medical records IBM had regarding Ms. Cuff.

26. Dr. Spitz had performed evaluations for the IBM medical department before his examination of Ms. Cuff. Before Ms. Cuff was sent to Dr. Spitz, Dr. Spitz had examined at Dr. Tomasi's request an IBM employee who claimed to be suffering from chronic fatigue syndrome. In that case, Dr. Spitz found that the medical evidence supported the diagnosis and concluded that the employee was disabled.

27. In a letter dated June 29, 1989, Ms. Jennings informed Ms. Cuff of the required appointment with Dr. Spitz. Dr. Spitz examined Ms. Cuff on July 6, 1989. As part of his evaluation, Dr. Spitz reviewed plaintiff's medical history and medical records, performed a physical examination and took blood tests.

28. Dr. Spitz concluded that Ms. Cuff did not suffer from chronic fatigue syndrome or any disabling illness and that she could work. Dr. Spitz's conclusions were based on the lack of any significant abnormalities in the physical examination or test results. In a letter to Dr. Tomasi dated July 11, 1989, Dr. Spitz concluded, "... I see no reason why this woman cannot return to absolutely full activities without restriction, as of this time. I find no evidence of chronic fatigue syndrome or chronic EBV virus infection. All studies have been within normal limits."

29. Dr. Tomasi reviewed Dr. Spitz's letter, found his evaluation to be extensive and complete, and accepted Dr. Spitz's conclusions. The IBM medical department notified Ms. Cuff's manager that she was able to work.

---

4. Dr. Tomasi wrote "can't predict lost time but states she's looking for disability" in plaintiff's medical history sheet. Regarding this notation, he testified: "... I have to use this as the gist of the conversation ... I use that term for disability as to mean long-term disability, some form of a long-term disability, as opposed to the short-term S and A or sick leave as we think of it."

30. Ms. Cuff returned to work on July 10, 1989.

31. On July 20, 1989, Ms. Cuff reported that she was ill and did not come to work. She also missed work on July 21 but returned on July 24.

32. On July 24, 1989, Ms. Jennings informed Ms. Cuff that IBM's medical department determined that she was able to work and that any further absences due to illness would have to be supported with documentation from her doctor and approved by IBM's medical department. Ms. Jennings memorialized this conversation in a letter to plaintiff the same day.

33. Plaintiff did not miss a day of work from July 24, 1989 until January 1990.

34. On September 1, 1989, Ms. Cuff was assigned to the position of Guided Learning Center administrator, under the management of Mr. Greg Ferrara. Ms. Cuff's responsibilities included showing and setting up courses for IBM employees and customers, so they could educate themselves on IBM products. Mr. Ferrara testified that she performed well in that position.

C. Dr. Bellesorte's Diagnosis

35. Ms. Cuff stopped seeing Dr. Lane sometime in the fall of 1989. On January 11, 1990, she began seeing Dr. Joseph Bellesorte, who is an osteopath with a family practice. He treats many patients—more than half—who are diagnosed with Chronic Fatigue Syndrome. Dr. Bellesorte testified that few, if any, of his patients diagnosed with Chronic Fatigue Syndrome have recovered.

36. Ms. Cuff's first visit with Dr. Bellesorte lasted approximately two hours. Dr. Bellesorte diagnosed Ms. Cuff as suffering from chronic fatigue syndrome. His diagnosis was based on Ms. Cuff's account of her symptoms.

37. During her initial visits, plaintiff testified, she was advised by Dr. Bellesorte to take time off from work and explore the availability of either short-term or long-term disability programs at IBM.

38. Dr. Bellesorte based his diagnosis on the criteria set forth in a March 1988 article entitled, "Chronic Fatigue Syndrome: A Working Case Definition," published in the Annals of Internal Medicine. The primary author of the article, Dr. Gary Holmes, is associated with Center for Disease Control in Atlanta, Georgia.

39. Dr. Bellesorte stated that the requirements for diagnosing chronic fatigue syndrome consist of two major criteria, eleven minor criteria and three physical criteria. He testified that "you need to have both major criteria and they are that it's a onset, new onset or persistent relapsing debilitating fatigue in a person who has no previous history of that disease." He elaborated that this condition must be severe enough to reduce the person's daily activity to 50 percent of its prior level and has to have been present for at least six months.

40. The second major criteria, Dr. Bellesorte testified, "is that all other diseases or entities which could cause this type of situation are ruled out."

41. Dr. Bellesorte testified that he diagnosed Ms. Cuff as having chronic fatigue syndrome during her first visit to his office. He based his diagnosis on Ms. Cuff's account of her symptoms.[5]

42. On cross-examination, Dr. Bellesorte stated that he did not "know exactly when" plaintiff experienced a new onset of fatigue. He explained that it "could have been . . . as early as 1981. It could have been in '84 or '85."

43. On cross-examination, Dr. Bellesorte acknowledged that he knew Ms. Cuff was working from July 1989 through January 1990. Specifically, he testified: "I think she told me she was working, I know she was working. I didn't know if she was working steadily during that time or just partially or whatever." He also stated that he did not perform a complete physical examination on

---

5. Dr. Bellesorte testified that Ms. Cuff's description of her condition led him to conclude that she had eight of the eleven minor criteria necessary for diagnosing chronic fatigue syndrome. He also stated that there is no objective way to measure those criteria—"these are all subjective, the first eleven criteria of the minor criteria are all subjective."

Ms. Cuff during her first visit, although he did take her temperature and blood pressure.

44. On January 19, 1990, plaintiff telephoned IBM's medical department in New York and inquired about the availability of "sick time" for a period of three to six months. She was told to send a signed release of her medical information form and a letter from her doctor to Dr. Tomasi. In her testimony, Ms. Cuff acknowledged that she was not discouraged from seeking disability benefits.

45. On January 30, 1990, Ms. Cuff did not come to work. Mr. Ferrara, who supervised plaintiff, telephoned her at home. She told him that she did not feel well and that she might be out for some time. After this conversation, Mr. Ferrara notified IBM's medical department of Ms. Cuff's absence.

46. On January 30, 1990, Dr. Bellesorte drafted a handwritten note stating that plaintiff "is under my care for Chronic fatigue and Immuno-dysfunction syndrome (CFIDS) and due to this condition will be unable to return to work for an indefinite period of time."

47. On February 8, 1990, Dr. Tomasi received Ms. Cuff's medical release authorization and Dr. Bellesorte's handwritten note. Dr. Tomasi believed that Dr. Bellesorte's note was too vague to substantiate Ms. Cuff's claim of disability and therefore telephoned him on February 12, 1990, to obtain additional information about her condition. They spoke for ten to fifteen minutes.

48. Dr. Tomasi testified that the conversation did not provide him with any new information to persuade him that Ms. Cuff was unable to work. Dr. Tomasi notified Ms. Cuff's management team that Ms. Cuff was able to return to work.

49. On February 13, 1990, Mr. Ferrara called Ms. Cuff and told her the medical department did not support her absence and that she should return to work. During her conversation with Mr. Ferrara, Ms. Cuff requested that IBM speak with Dr. Bellesorte again.

50. On February 13, 1990, Dr. Tomasi spoke with Dr. Bellesorte again, this time for 20 to 30 minutes. Dr. Tomasi informed Dr. Bellesorte that in order for IBM to justify Ms. Cuff's absence, he would have to supply some objective medical information to support his diagnosis. Dr. Bellesorte reiterated his diagnosis of chronic fatigue syndrome. Dr. Tomasi reviewed Ms. Cuff's medical history, including evaluations performed by Dr. Frenkel and Dr. Spitz, with Dr. Bellesorte and told him that Ms. Cuff's symptoms were reported to two previous doctors who concluded that she was not disabled. Dr. Tomasi encouraged Dr. Bellesorte to persuade Ms. Cuff to return to work.

51. In February 1990, Dr. Tomasi determined that another evaluation of Ms. Cuff 1990 was unnecessary. He testified that he based his decision on the medical evaluations by Dr. Frenkel and Dr. Spitz, which did not produce a diagnosis of chronic fatigue syndrome, and Dr. Bellesorte's failure to produce new information concerning Ms. Cuff's condition.

52. On cross-examination, Dr. Tomasi stated that he did not believe that plaintiff was "making up" her account of her symptoms and that he did not believe that Dr. Bellesorte misrepresented his findings to IBM.

53. Dr. Tomasi has approved payment of IBM sickness and accident benefits to at least one employee who was diagnosed with chronic fatigue syndrome.

54. Dr. Sherman, Dr. Tomasi's supervisor, agreed with Dr. Tomasi's decision not to seek an additional consultation. In his view, Dr. Bellesorte did not present any physical evidence or new laboratory results to support his diagnosis. Dr. Sherman testified that he believed that the objective medical evidence and the information provided by doctors who had examined Ms. Cuff did not support Ms. Cuff's claim of chronic fatigue syndrome.

D. Plaintiff's Discharge

55. During his telephone conversation with plaintiff on February 13, 1990, Mr. Ferrara told Ms. Cuff to return to work the next day and that her failure to do so would lead to her discharge from IBM.

56. On February 14, 1990, Ms. Cuff did not come to work. Ms. Cuff testified that

she was physically unable to go to work that day.

57. After consulting with his managers, Ms. Jennings and Ms. Eleanore Arena, defendant's medical department and its personnel department, Mr. Ferrara made the decision to discharge Ms. Cuff. Ms. Cuff was discharged because IBM's medical department had determined that she was capable of returning to work immediately, and when directed to report to work, Ms. Cuff did not.

58. Mr. Ferrara telephoned Ms. Cuff to inform her of this and sent a letter confirming the decision to her the same day.

59. Mr. Ferrara testified that there was no intent on the part of management to deprive Ms. Cuff of her benefits. Plaintiff's managers testified that whether plaintiff received benefits under defendant's disability plans had no impact on their budgets or on how their performance was evaluated.

60. Ms. Cuff testified that she was never told that her discharge was a result of anything other than her failure to report to work, or that IBM did not want to pay her disability benefits.

61. On February 18, 1990, Dr. Bellesorte sent a letter reviewing Ms. Cuff's medical history to Dr. Tomasi. The letter repeated Dr. Bellesorte's diagnosis of chronic fatigue syndrome as the underlying illness affecting Ms. Cuff. Dr. Bellesorte included his office notes and provided laboratory test results with his letter. He testified that his letter was based on Ms. Cuff's subjective account of how she felt, with the exception of the report of swollen glands.

62. Dr. Tomasi testified that the letter and the test results did not convince him that Ms. Cuff was suffering from chronic fatigue syndrome. In his view, the test results were within normal limits. Dr. Tomasi stated that "the letter and the medical information that Dr. Bellesorte provided does not offer us any new information and does not add to our understanding of the disease process or her symptoms, and it also provided no documentation for her needing to be out on disability or being absent."

E. Plaintiff's Appeals of her Discharge

63. Ms. Cuff appealed her discharge by using IBM's "Open Door" procedure. The Open Door gives employees the opportunity to appeal management decisions to higher management.

64. Ms. Cuff wrote a letter to Mr. John Akers, the chairman and chief executive officer of IBM. She believed that he could reverse the decision to discharge her.

65. Mr. Larry Deaton was assigned as investigator and as Ms. Cuff's advocate in the appeal of her discharge. As part of his investigation, he met with Ms. Cuff, her managers and members of IBM's medical department.

66. Mr. Deaton requested that Ms. Cuff submit a "definitive report" showing that she had chronic fatigue syndrome. Ms. Cuff testified that such a report was impossible to produce because a "definitive test" to diagnose chronic fatigue syndrome does not exist.

67. Mr. Deaton concluded that Ms. Cuff had been treated fairly and told her so.

68. After her Open Door review, Ms. Cuff filed a state law handicap discrimination claim with the Pennsylvania Human Relations Commission (PHRC). She claimed that she was discharged because of her handicap, Chronic Fatigue Syndrome.

69. The PHRC held a hearing that included a fact-finding session. As a result of the session, the PHRC determined that Ms. Cuff's complaint should be dismissed "because the facts of the case do not establish that probable cause exists to credit the allegations of unlawful discrimination." In its findings, the PHRC found that the reasons for Ms. Cuff's discharge were based on her failure to report to work and to provide a medically justified reason for her absence.

III. Conclusions of Law

1. Section 510 of ERISA provides:

It shall be unlawful for any person to discharge ... or discriminate against a participant or beneficiary for exercising any right to which he is entitled under the provisions of an employee benefit plan, ... of for the purpose of interfering with the attainment of any right to which such par-

**32**

ticipant may become entitled under the plan, ...

29 U.S.C.A. § 1140. *See also Turner v. Schering–Plough Corp.*, 901 F.2d 335, 347 (3d Cir.1990) (quoting *Gavalik v. Continental Can Co.*, 812 F.2d 834, *cert. denied* 484 U.S. 979, 108 S.Ct. 495, 98 L.Ed.2d 492 (1987).

2. As the Court of Appeals stated, "the employee must show that the employer made a conscious decision to interfere with the employee's attainment of pension eligibility or greater benefits." *Turner v. Schering–Plough Corp.*, 901 F.2d at 347. *See also Gavalik v. Continental Can Co.*, 812 F.2d at 851 (plaintiff must demonstrate that the defendant had " 'specific intent' to violate ERISA.") (citations omitted).

3. The allocation of the burdens of production and persuasion used in cases under Title VII and the Age Discrimination in Employment Act ("ADEA") is similar in a section 510 case. The Court of Appeals explained:

> The employee has the burden of tendering evidence that constitutes a "prima facie" case. If such evidence is tendered, the employer has the burden of articulating a permissible reason for the adverse personnel action. Once there has been such an articulation, the employee has the burden of persuasion on the issue of whether an intent to interfere with rights secured by ERISA played a determinative role in the decision to take that action.

*Id.*

4. To establish a prima facie case, plaintiff must show that "(1) prohibited employer conduct (2) taken for the purpose of interfering (3) with the attainment of any right to which the employee may become entitled." *Gavalik v. Continental Can Co.*, 812 F.2d at 852.

5. Plaintiff concedes she does not have any direct evidence of discrimination by defendant.

6. In my view, she also has not presented any circumstantial evidence that she was fired by defendant to prevent her from receiving disability benefits. Specifically, I conclude that plaintiff's failure to return to work after her manager directed her to do so constitutes a legitimate reason for her termination. I therefore conclude that plaintiff

has not demonstrated that she has a prima facie case of discrimination prohibited by section 510. *See, e.g. Clark v. France Compressor Products*, 694 F.Supp. 112, 115 (E.D.Pa. 1988) (granting summary judgment for defendant in section 510 case because of plaintiff's failure "to designate any facts showing specific intent.").

7. Alternatively, assuming that plaintiff has established a prima facie case, I believe that defendant articulated a legitimate reason for discharging her. Again, I believe that plaintiff's failure to return to work after her manager directed her to do so constitutes a legitimate reason for her termination. I do not believe defendant's decision to fire plaintiff after she did not return to work was a pretext for discharging her in order to prevent her from receiving disability benefits. *Cf. Zipf v. American Tel. and Tel. Co.*, 799 F.2d 889, 894–95 (3d Cir.1986) (citing two specific disputes of material fact preventing entry of summary judgment in favor of defendant in section 510 case, including probative remarks by plaintiff's supervisor).

8. Accordingly, I will enter judgment in favor of defendant and against plaintiff.