**Bernard J. VILCHOCK, Plaintiff,**

v.

**The PROCTER & GAMBLE PAPER PRODUCTS COMPANY, Defendant.**

**No. 3:CV 92–1248.**

United States District Court, M.D. Pennsylvania.

Aug. 3, 1993.

Peter G. Loftus, Scranton, PA, for plaintiff.

John Jay Myers, William J. Klemick, Eckert, Seamans, Cherin & Mellott, Pittsburgh, PA, for defendant.

## MEMORANDUM AND ORDER

CONABOY, District Judge.

Plaintiff, Bernard Vilchock, commenced this action on September 9, 1992, after his discharge from the Defendant company, Procter & Gamble Paper Products, claiming Procter & Gamble discriminated against him on the basis of his age and alleged handicap, and further that the Defendant retaliated against him for engaging in activity protected under the Age Discrimination in Employment Act, 29 U.S.C. §§ 621, et seq. and the Pennsylvania Human Relations Act, 43 P.S. §§ 951, et seq. Plaintiff also asserts claims for wrongful discharge, breach of contract, and intentional infliction of emotional distress.[1]

The Defendant has recently filed a Motion for Summary Judgment, attacking all aspects of Plaintiff's complaint.[2] After carefully reviewing the Defendant's motion, the Plaintiff's response, and the various supporting documents, we find that summary judgment in favor of the Defendant is appropriate.

## BACKGROUND

Plaintiff Vilchock began working for Procter & Gamble on May 23, 1966, and at all relevant times was an Electrical/Electronic Technician IV in the Pampers E & I section. (Doc. No. 1, p. 3). Plaintiff was discharged from his employment with Procter & Gamble on July 29, 1991, at age fifty-two (52).

The events giving rise to this case appear to date back to April 30, 1989, when Plaintiff injured his head on a falling chair lift assembly from a case packer, receiving a laceration of the scalp and post concussional syndrome secondary to head trauma. Plaintiff claims because of this injury he began suffering from headaches and sleep disorders which caused him to be either absent from or late for work. Plaintiff admits he was absent or tardy at least a total of 33.25 hours, 13 of which Plaintiff claims he was sent home for discipline, 8 hours for illness, and 7.5 for rehabilitation. (Doc. No. 1, p. 3). Plaintiff contends that despite his injury, Plaintiff's manager, Greg Herlan, began harassing him concerning his alleged absences and tardiness. (Doc. No. 1, p. 3).

---

1. Upon review of the claims asserted by the Plaintiff, it is apparent to the Court not all of them warrant discussion as many of them are unsubstantiated, completely without merit, and only summarily addressed by the Plaintiff. As such, the Court will not formally address all of the claims asserted by the Plaintiff, but only those claims which raise legitimate legal issues.

2. It should be noted that the Defendant previously filed a Motion to Dismiss. After reviewing the motion, Plaintiff responded by agreeing to dismiss Counts III and VI of the complaint which allege discrimination on the basis of handicap under Title VII and discrimination based on the Rehabilitation Act, 29 U.S.C. § 701, et seq., respectively. The Defendant then filed the present Motion for Summary Judgment addressing many of the same issues raised in its previous Motion to Dismiss. Accordingly, the Defendant indicated a desire to have his Motion to Dismiss withdrawn as moot. The Defendant, however, continued to express concern that Plaintiff had not complied with the mandatory prelitigation administration requirements necessary for filing a discrimination suit. Upon reviewing Plaintiff's complaint and finding it to be completely void on this issue, we directed Plaintiff to brief this sole issue. The briefing now having been completed, the Court is satisfied there are no jurisdictional defects which would prevent the Court from ruling on this matter. (See Defendant's Brief In Response to Plaintiff's Brief Sur Exhaustion of Administrative Prerequisites, Doc. No. 33).

Plaintiff next claims he was confronted on May 6, 1990, about the possibility of being an alcoholic. As a result of this confrontation, Plaintiff was placed in the Marworth Rehabilitation Facility and remained there until June 11, 1990. The cost of Plaintiff's stay at Marworth was furnished by the Defendant, either directly or through its insurance. (Plaintiff's Deposition, Doc. No. 19, pp. 135–136).

Plaintiff continues that during April of 1991, Greg Herlan's replacement, Solomon Cohen, called Plaintiff into his office and indicated Plaintiff was not reliable since his return from Marworth even though Plaintiff was only late three (3) times in that ten (10) month period. (Doc. No. 1, p. 4).

As a result of Plaintiff's absences, the Defendant made an appointment for the Plaintiff with a sleep specialist, who recommended that Plaintiff be placed on steady day shift work due to abnormal circadian rhythms. Plaintiff was also placed on permanent partial disability. Plaintiff asserts that after being placed on permanent partial disability the harassment by Cohen increased in that Plaintiff was approached every day by Cohen and constantly under observation. (Doc. No. 1, pp. 4–5).

Plaintiff goes on to contend that in early June of 1991 he requested to see his personnel file, at which time Plaintiff allegedly found entries made by both Greg Herlan and Bill Lacoe without Plaintiff's knowledge. As a result, on June 24, 1991, Plaintiff notified David Taylor, the Plant Manager's secretary, about these entries, as well as the alleged harassment. Plaintiff claims, however, Taylor never got back to him on the file entries or the alleged harassment.

The next incident complained of by the Plaintiff occurred on Friday, July 19, 1991, when Department Manager, Tom Lang, came to the E & I shop and told the Plaintiff, as Plaintiff was preparing to leave, that he needed him to stay. Plaintiff advised Lang that "he had an appointment and that company policy requires that the persons required to stay after normal working hours for overtime must be so notified at least one hour in advance of the end of the shift." (Doc. No. 1, p. 6). Plaintiff refused to stay. After this incident, Plaintiff went on vacation and subsequently returned to work on July 29, 1991. Upon his return, Plaintiff claims he was read his termination papers, accused of foul language and insubordination and escorted out the door.

Based on these facts, Plaintiff claims he was improperly discharged on the basis of his age and his alleged handicap and, further that the Defendant "has a history of terminating individuals" who have been injured on the job but are still capable of performing their assigned responsibilities, as well as "a history of age discrimination." (Doc. No. 1, p. 6).

The Defendant responds by noting Plaintiff was discharged due to Plaintiff's history of performance problems, in particular reliability, sleeping at work, failure to follow procedures, as well as insubordination and belligerence.

I

## SUMMARY JUDGMENT

Federal Rule of Civil Procedure 56(c) requires that we render summary judgment "... forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." "[T]his standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). (emphasis in original).

In determining whether an issue of material fact does exist, all inferences must be drawn against the moving party. *White v. Westinghouse Electric Company,* 862 F.2d 56, 59 (3d Cir.1988); 6 J. Moore, Moore's Federal Practice ¶ 56.04[2]. In order to stave off a summary judgment motion, however, the non-moving party may not rest on the bare allegations contained in his or her

pleadings. Once the moving party has satisfied its burden of identifying evidence which demonstrates an absence of a genuine issue of material fact, *see Childers v. Joseph*, 842 F.2d 689, 694 (3d Cir.1988), the nonmoving party is required by Federal Rule of Civil Procedure 56(e) to go beyond the pleadings by way of affidavits, depositions, answers to interrogatories or the like in order to demonstrate specific material facts which give rise to a genuine issue. *Celotex Corporation v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986).

## II

### DISCUSSION

Defendant Procter & Gamble bases its pending Motion for Summary Judgment on several grounds, the most noteworthy of which are: (1) Plaintiff cannot establish that Defendant's reasons for discharging him were pretextual and in violation of the ADEA; (2) it is questionable whether Plaintiff's alleged handicap, a sleep disorder, is a covered disability and, in the alternative, Plaintiff cannot establish his sleep disorder was a determinative factor of his discharge; (3) Plaintiff has not shown that he engaged in any protected activity before his discharge so as to constitute a retaliatory discharge; (4) there is no evidence of a contract between Plaintiff and Procter & Gamble limiting the Defendant's right to discharge the Plaintiff at will; and, (5) Plaintiff has not established that his discharge violated any public policy, thus, Plaintiff has not demonstrated that he was wrongfully discharged. (Doc. No. 18).

#### A. *The Age Discrimination In Employment Act*

 There is a well settled framework of evidentiary burdens under the Age Discrimination in Employment Act, 29 U.S.C. §§ 621 *et seq.* (hereinafter ADEA). First, the Plaintiff has the burden of proving by a preponderance of the evidence a prima facie case of discrimination. In order to make out a prima facie case, Plaintiff must show that (1) he is a member of a protected class, i.e. is at least 40 years of age; (2) he was qualified

for the position; (3) was dismissed despite being qualified; and (4) ultimately was replaced by a person sufficiently younger to permit an inference of age discrimination. *Gray v. York*, 957 F.2d 1070, 1078 (3d Cir. 1992). Once the Plaintiff has established a prima facie case an inference of unlawful discrimination is created. *Id.*

 If the Plaintiff succeeds in proving the prima facie case, the burden shifts to the Defendant to articulate some legitimate non-discriminatory reason for the employee's discharge. Once a legitimate reason for the discharge is provided, the burden shifts back to the Plaintiff to prove by a preponderance of the evidence that the reasons offered by the Defendant were not its true reasons, but were merely a pretext for discrimination. *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 252–253, 101 S.Ct. 1089, 1093–94, 67 L.Ed.2d 207 (1981) (citations omitted); *See also Turner v. Schering–Plough Corp.*, 901 F.2d 335, 342 (3d Cir. 1990); *Chipollini v. Spencer Gifts, Inc.*, 814 F.2d 893, 897 (3d Cir.1987). "At all times, the plaintiff-employee has the burden of persuading the trier of fact that age was a determinative, though not necessarily the sole, factor in the defendant-employer's decision to [discharge] the employee." *Gray, supra*, at 1078 (citing *Turner v. Schering–Plough Corp.*, 901 F.2d 335, 342 (3d Cir. 1990)).

 As noted, the Defendant claims Plaintiff was dismissed due to a history of performance problems. To support this contention the Defendant has provided the Court with the affidavit of Joseph Dussinger, Employee Relations Manager for the Diaper Plant at Mehoopany and one of the individuals responsible for Plaintiff's discharge, as well as various supporting documentation, all of which identify specific weaknesses in Plaintiff Vilchock's work performance. (Doc. No. 28). For example, on December 10, 1987 (almost two years before Plaintiff's head injury), Plaintiff was placed on Step III of the discipline procedure,[3] for sleeping on the job. The entry in Plaintiff's file reads as follows:

---

3. The discipline procedure of Procter & Gamble consists of five steps of discipline, the fifth of

Today at 8:17 a.m. I (V. Uporsky) went up to the pampers E & I shop to put information on the bulletin board and into the information book. After I had done the above I observed Bernie sitting in a chair with his feet propped up on the work bench asleep. I waited three minutes or so at which time I woke him up. I had just talked to Bernie about his tone and approach and negative interface with his peers and others the last time he was on day shift approximately three weeks ago. This behavior is not expected from anyone let alone someone in a leadership role.... I am placing Bernie at Step III of the disciplinary procedure for failure to meet the compairer [sic] week standard. Any further violation of this policy or any other [ ] policy may lead to further disciplinary action up to and including termination.

Another incident Defendant cites to support its claim of Plaintiff's poor work performance occurred on February 2, 1989, again prior to Plaintiff's injury, when Plaintiff incorrectly calibrated a scale on one of the production lines, causing the line to run for a week putting out an unusable product. (Doc. No. 18, p. 3). As a result of this incident, Plaintiff was placed at Step IV of the disciplinary process. Plaintiff attempts to explain this event in his deposition by noting:

... This particular incident here, I was called away from this job, to my recollection. And in the process, by the time I got back to it, neglected to make the final calculation.

But I was working with somebody else that needed help and that wasn't taken into consideration....

(Plaintiff's Deposition, Doc. No. 19, p. 87).

Another factor which the Defendant refers to as affecting Plaintiff's job performance is his continued absences. Specifically, on March 8, 1990, Plaintiff was returned to Step III of the procedure, but told that his absences were still a problem. (Doc. No. 28, Exh. C). In commenting on Plaintiff's ab-

sences, Greg Herlan, Plaintiff's manager, noted in Plaintiff's personnel file:

In the first three months Bernie's performance was excellent, however, Bernie's attendance has risen back to 4 incidents of a total of 48 hours (this does not include his head injury or carpal tunnel). I am keeping him at Step III because of this. Bernie's work level and interface skills have diminished a little since those first three months. I hope this is not a trend. Bernie does need to improve his attendance to remove himself from disciplinary steps.

Another noteworthy incident concerning Plaintiff's absences occurred on February 7, 1991. On that date it was written in Plaintiff's personnel file:

He (Plaintiff) has had three incidents of late since his release from Marworth. He is currently at Step IV in the disciplinary system. Bernie has stated that he has a sleep disorder and is unable to get up in time for work every once in a while as evidenced by his attendance record. We have no documentation to substantiate this and in addition, he stated that he averages 3½ hrs sleep a night and sometimes as little as 2½ hrs. I told Bernie that I would work with Medical to do 2 things: (1) to evaluate his stated sleep disorder and to (2) establish work restrictions as a result of such limited sleep. We need to understand his ability to function safely in his current job.

In an effort to document Plaintiff's alleged sleep disorder the Defendant called upon Dr. Zurad, Procter & Gamble's physician, to examine the Plaintiff. Dr. Zurad recommended that Plaintiff be placed on day shift and that his duties be modified. Dr. Zurad also sent Plaintiff to various medical specialists for diagnosis and treatment. Other than the above, there is no evidence in the record to establish a medical condition which would cause Plaintiff's repeated absences.

The Defendant also refers to its dissatisfaction with Plaintiff's manner and choice of language. The record is replete with inci-

which is discharge. (Doc. No., 18, p. 3). If an employee is at Step IV and is disciplined again, the next step would be discharge. The policy also provides that discharge or suspension could

result from the first offense for, among other things, insubordination and failure to treat other employees with appropriate respect. (Doc. No. 18, p. 3).

dents where Plaintiff allegedly was abusive and belligerent. For example, a Disciplinary Discussion dated May 5, 1990, reads:

I also talked with Bernie about his conduct in Greg Herlan's conversation with him (at which I (W.A. Lacoe) was present). Bernie became irrational and belligerent. I told him this was unacceptable and that he was an adult and I expected him to conduct himself as such. Bernie told me that at times he feels threatened and responds accordingly. I told him that there are other ways to respond and we would not tolerate his irrational behavior.

(Doc. No. 28, Exh. C).

In addition, Defendant contends that on July 11, 1991, toward the end of a team building meeting, Plaintiff got up to leave. When Plaintiff's manager told him that the meeting was not over and asked him where he was going, Plaintiff responded that he needed to go to the bathroom and did not want to work late. Plaintiff then left the meeting. When Plaintiff's manager presented him with a file entry reflecting this incident, Plaintiff refused to sign it, said it was garbage, and called his manager an "asshole." (Doc. No. 18, p. 4).

Based on all of the above, we find that the Defendant has proffered several legitimate nondiscriminatory reasons for Plaintiff's discharge, i.e. performance problems, unacceptable reliability, sleeping at work, failure to follow procedures, insubordination, foul language, and belligerence. As such, the Plaintiff must now demonstrate by a preponderance of the evidence that the reasons proffered by the Defendant were not its true reasons, but were merely a pretext for discrimination. This the Plaintiff has not done. In fact, the Plaintiff himself admits he has no facts to substantiate his claim of age discrimination. For example, Plaintiff's deposition reads as follows:

Q. ... Let me ask you this: In your 25 years with Procter & Gamble, did anyone ever say anything to you—any management person in the position of authority—that in your opinion showed that this company has a bias against older technicians such as yourself?

A. They would never say a thing like that to me.

Q. So the answer is no?

Q. Did you ever observe age discrimination on the part of this company against any other employees?

A. Not that I could say, no.

(Plaintiff's Deposition, Doc. No. 19, p. 205).

Plaintiff went on to testify:

Q. In the complaint there is a statement that—

Q. Let me ask you this question: —Procter & Gamble has history of age discrimination.

Ms. Siberski: To what paragraph are you referring?

Mr. Myers: Thirty-five.

Q. Do you know of any facts to substantiate this statement?

A. Facts?

Q. Yes.

A. No.

(Plaintiff's Deposition, Doc. No. 19, p. 209).

In addition, Plaintiff, in response to Defendant's accusations of poor work performance, states only that:

The Defendants [ ] go into an interpretation of what the evidence shows. Yet, it is not for counsel to interpret what the evidence shows, but rather, for the trier of fact to make a determination as to what actually occurred.

The Plaintiff may very reasonably not have information concerning younger employees who were disciplined less severely than he for other infractions. Yet, there is, as witnessed by the affidavit of Plaintiff's counsel,[4] other people who are in the pro-

---

4. While the Plaintiff refers to Counsel's affidavit with exhibits, none were filed with the Court. Upon discovering their absence, the Court contacted Attorney Loftus who indicated he would file them immediately. A few days later Attorney Loftus filed an affidavit indicating Counsel's personal knowledge of two individuals employed by

Procter & Gamble, one of whom was granted disability leave, the other of whom was disabled while at work and collecting Workmen's Compensation. (Doc. No. 30).

The Court would be remiss if we did not at least question how an affidavit from Plaintiff's

tected group who have been treated differently, (Counsel's affidavit with exhibits). For the Defendant to make an allegation that there is no evidence which permits an inference that age was a factor in the discharge, it [sic] is therefor [sic] bogus. (Doc. No. 27, p. 10).

Based on the sparse evidence presented by the Plaintiff, we can in no way conclude that the Plaintiff can successfully demonstrate by a preponderance of the evidence that the Defendant's proffered reasons for discharge are unworthy of credence. Accordingly, we find there is insufficient evidence in the record to demonstrate the Plaintiff can prove age discrimination by Defendant Procter & Gamble against Plaintiff Vilchock.

### B. *Handicap Discrimination*

█ Plaintiff next alleges in Count VI of his complaint that the Defendant discriminated against him "on the basis of his handicap [sleep disorder]" in violation of 43 P.S. § 951, et seq. (Doc. No. 1, p. 10). Even if we accept Plaintiff's contention that his sleep disorder is a handicap, we find there is no conclusive evidence that he was discharged because of his sleep disorder. Rather, the unrefuted evidence of record establishes that Plaintiff's alleged sleeping problem, in addition to several other performance and discipline problems, many of which occurred prior to his injury, affected Plaintiff's ability to perform his job satisfactorily. Clearly, an employee's inadequate job performance is a legitimate consideration and reason for discharge.

Moreover, the record shows that Defendant made substantial efforts to accommodate the Plaintiff's alleged sleep disorder by sending him to several medical specialists, taking him off rotating shifts, and permitting him to work steady day shifts. The Defendant was patient with the Plaintiff waiting for him to improve both his alleged sleep disorder and job performance. Unfortunately, this did not happen.

The Plaintiff does not come forward with any type of substantive evidence to refute the Defendant's contentions. Instead, the Plaintiff simply notes:

All of the documentation demonstrate[ ] that the disciplinary actions were setups, and as such were pretextual in nature in an effort to obtain grounds upon which the employer could terminate the Plaintiff. Obviously, it was not mere coincidence that on two (2) separate occasion [sic], with only minutes to go prior to the shift being concluded, the Plaintiff was approached by supervisors in an effort to have him remain although such efforts were clearly in violation of company policy. (Doc. No. 27, p. 12).

Accordingly, we find that there is no evidence Plaintiff was discharged due to a handicap.

### C. *Retaliatory Discharge*

█ In Count V of the complaint Plaintiff alleges that the Defendant retaliated against him for having complained to the PHRC and the EEOC in violation of the ADEA and PHRA. In defending against this claim, the Defendant correctly points out the Plaintiff did not engage in any protected activity before his discharge so as to constitute a retaliatory discharge. Plaintiff's deposition testimony offers evidence to support the Defendant's contention.

Q. Now, other than the complaint and proceedings that you initiated after you were discharged from Procter & Gamble, have you ever filed or made a complaint of discrimination to the Human Relations Commission or the Equal Employment Opportunity Commission or any other federal agency or state agency before?

A. Before this incident?

Q. Before you were fired.

A. No.

Q. Did you ever go to anyone at Procter & Gamble and tell them that you felt you were being discriminated against because of your age before your discharge?

counsel, which allegedly speaks to Counsel's personal knowledge of discriminatory conduct at Procter & Gamble, is admissible in this case. Obviously, utilization of this affidavit could po-

tentially make Plaintiff's Counsel a witness in the case, and thus, ultimately present a conflict with Attorney Loftus' representation of the Plaintiff at trial.

A. No.

Q. Did you ever go to anyone at Procter & Gamble and tell them that you felt that you were being discriminated against because of your handicap before you were discharged?

A. Because of my handicap, no.

Q. Did you ever complain to Procter & Gamble or notify Procter & Gamble or any member of management about any policies of the company that you felt were discriminatory against employees because of their age or their handicap or their effect on handicap employees?

A. Did I ever file a complaint, no?

Q. Did you ever make that kind of notation or suggestion?

A. No, no.

As the Plaintiff admittedly did not file or complain of any discriminatory practices prior to his discharge, Plaintiff can in no way claim the Defendant retaliated against him for something he did not do.

D. *Breach of Contract*

█ In Count VIII Plaintiff claims the Defendant breached a contractual relationship with the Plaintiff in that the termination was contrary to the agreement of the parties as set forth in the Defendant corporation's policy and procedural manual, as well as its Blue Book. (Doc. No. 1, p. 13).

█ It almost goes without saying that absent a contract an employer "may discharge an employee with or without cause, at pleasure, unless restrained by some contract." *Borse v. Piece Goods Shop, Inc.,* 963 F.2d 611, 614 (3d Cir.1992); *Smith v. Calgon Carbon Corp.,* 917 F.2d 1338, 1341 (3d Cir. 1990) (quoting *Henry v. Pittsburgh & Lake Erie Railroad Co.,* 139 Pa. 289, 21 A. 157 (1891)).

After reviewing the record, we find that Plaintiff was employed at-will. Our decision is further buttressed by two State Court opinions involving suits by technician-level employees against Procter & Gamble which have specifically found that Procter & Gamble paper plant employees are employed at-will. *See Davenport v. The Procter & Gam-*

*ble Paper Products Company,* 89 CV 879 (Wyoming County C.P.), *aff'd,* 425 Pa.Super. 652, 620 A.2d 544 (1992); *Faulls v. The Procter & Gamble Paper Products Company, et al.,* No. 89 CV 899 (Wyoming County C.P. January 15, 1993).

█ As Plaintiff is considered an at-will employee, we must now determine whether the Plaintiff has demonstrated evidence sufficient to alter his at-will status. We note, however, that the at-will presumption cannot be easily overcome. Only "clear evidence that the parties intended to contract for a definite period" will set aside this presumption. *Schoch v. First Fidelity Bancorporation,* 912 F.2d 654, 657 (3d Cir.1990) (quoting *Greene v. Oliver Realty, Inc.,* 363 Pa.Super. 534, 551, 526 A.2d 1192 (1987)). So where, as here, the employee attempts to overcome the at-will presumption on the basis of employer policies or a handbook, the language employed in those documents "must contain unequivocal provisions that the employer intended to be bound by it and, in fact renounced the principle of at-will employment." *Reilly v. Stroehmann Bros. Co.,* 367 Pa.Super. 411, 532 A.2d 1212, 1214 (1987).

A review of the Employee Information Booklet reveals it contains no language which one could argue, much less conclude, can be construed as an attempt to alter Plaintiff's at-will status. In fact, the Booklet specifically denies the formation of a contract, noting:

> The contents of this handbook may be changed, modified or terminated at any time with or without notice. This handbook does not create, nor should it be construed to create a contract with the Company, and any such implications are expressly denied.

(Doc. No. 19, Exh. B).

As to the Blue Book, the Plaintiff has completely failed to demonstrate on what provisions of the Blue Book he is relying to establish the formation of a contract. In addition, Plaintiff fails to identify "unequivocal provisions" in the Blue Book indicating the employer's intent to be bound by it and its intent to renounce the principle of at-will employment. *See Sweeney v. St. Joseph's*

*Hosp.,* 769 F.Supp. 747, 751 (M.D.Pa.1991). Thus, we also reject the Plaintiff's contention that the Blue Book created a contract of employment with the Defendant.

**E.** *Public Policy*

Lastly, with respect to Plaintiff's claim that his discharge violated public policy, we find that in light of our preceding disposition, this claim is without merit.

### III

### *CONCLUSION*

Based on a review of the record and the relevant case law, we find that the Plaintiff has no evidence that the Defendant engaged in any discriminatory conduct. The unrefuted evidence establishes that Plaintiff was discharged due to his discipline problems, insubordination, and abusive and belligerent conduct. Accordingly, the Defendant's Motion for Summary Judgment is granted.

An appropriate Order is attached.