UNITED STATES of America,
Plaintiff,

v.

Jerome LIGHTMAN, et al., Defendants.

No. CIV. A. 92–4710.

United States District Court,
D. New Jersey.

June 30, 1999.

Robert A. Gladstone, Nan Bernardo, Shanley & Fisher, P.C., Morristown, NJ, for Joint Defense Group.

Eric S. Aronson, Donna Libretti Cooke, Sills, Cummis, Zuckerman, Radin, Tischman, Epstein & Gross, Newark, NJ, for Defendant Stepan Company.

SIMANDLE, District Judge.

This matter is before the court on the motion of a subgroup of members of the Joint Defense Group ("JDG")[1] comprised of defendant Scott Paper Company ("Scott Paper") and third-party defendants Synthane–Taylor Corporation ("Synthane–Taylor"), Kiwi Brands, Inc. ("Kiwi"), Whiting–Paterson Company, Inc. ("Whiting–Paterson"), Wilmington Chemical Company ("Wilmington Chemical"), Stauffer Chemical Company ("Stauffer Chemical"), Quaker Chemical Corporation ("Quaker Chemical"), B & W Coatings/The Grow Group ("B & W") and FMC Corporation ("FMC") (collectively "the JDG Subgroup"), for summary judgment dismissing the cross-claims and/or third-party claims of defendant Stepan Company ("Stepan") for contribution under Section 113 of the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. § 9613, for past and future response costs Stepan has incurred at the Ewan and D'Imperio Superfund Sites. For the reasons set forth below, the court grants the JDG Subgroup's motion in part and denies it in part.

## BACKGROUND

This is a civil action to identify the parties that should bear the costs of cleaning up environmental contamination at the Ewan and D'Imperio Superfund Sites as the result of illegal dumping of hazardous waste at the sites by the Lightman Drum Company ("LDC") during the mid–1970's.

*Lightman Drum Company*

In a separate Opinion and Order of today's date, the court has granted the JDG's motion for partial summary judgment in favor of the JDG and against LDC and Jerome Lightman declaring LDC and Lightman severally liable for contribution to the JDG under Section 113 of CERCLA for past and future response costs at the

Ewan and D'Imperio Superfund Sites. The history of LDC's disposal activities at the Ewan and D'Imperio Sites is summarized as follows.

LDC began operation as a business buying and selling reconditioned 55–gallon drums in the late 1950's or early 1960's. (Gladstone Certification ("Gladstone Cert."), Ex. 1, pg. 3, A–1 and A–3; Ex. 10, A–1 and A–3.) In April of 1974, LDC moved its operation from Philadelphia to a new location in the vicinity of Berlin, New Jersey. (Gladstone Cert., Ex. 1, pg. 3, A–2; Ex. 10, A–2.)

LDC's reconditioned drum business consisted of removing empty drums from customer locations, selling them directly to a drum reconditioner, and selling reconditioned drums to its customers. (Gladstone Cert., Ex. 1, pgs. 3–4, A–4 through A–6; Ex. 10, A–4 through A–6.) Though empty drums received by LDC for reconditioning may have contained a waste residue, LDC did not begin removing drums filled with waste until 1972. (Gladstone Cert., Ex. 1, pg. 5, A–8; Ex. 10, A–8.)

The founder and president of LDC was Marvin ("Mike") Lightman. He was in charge of LDC operations during his lifetime. (Gladstone Cert., Ex. 1, pg. 6, A–12 and A–13; Ex. 10, A–12 and A–13.) It was principally he who made arrangements for drum waste disposal at the various disposal locations utilized by LDC. (Gladstone Cert., Ex. 1, pg. 6, A–14; Ex. 10, A–14.)

Jerome Lightman is the son of Mike Lightman. Between 1970 and 1978, Jerome Lightman served as Vice–President of LDC. (Gladstone Cert., Ex. 1, pgs. 6–7, A–15 & A–16; Ex. 10, A–16.) As Vice–President, Jerome Lightman served LDC as a truck driver, and maintained oversight responsibilities of the LDC yard. (Gladstone Cert., Ex. 1, pg. 7, A–17 and A–18;

1. The members of the JDG are: Aluminum Shapes Inc., Colonial Heights Packaging, Inc., Continental Holding, Inc., Croda Inks Corporation, DAP, Inc., Scott Paper Company, Sonoco Products Company, Union Carbide Corporation, USG Corporation, USX Corporation, Air Products & Chemicals, Inc., Kiwi Polish Company, a/k/a Kiwi Brands, Inc., Stauffer Chemical Corporation, Synthane–Taylor Company, Whiting Paterson Company, Inc., and Wilmington Chemical Company.

Ex. 10, A–17 and A–18.) Jerome Lightman also supervised operations for Mike Lightman when Mike Lightman was not available and made disposal decisions at such times, some of which occurred during the relevant time period ("RTP") in this litigation. (Gladstone Cert., Ex. 2, pg. 237, line 23 through pg. 238, line 10.) Jerome Lightman assumed the responsibilities previously undertaken by his father after his father became ill in 1976. Mike Lightman died in September, 1978. (Gladstone Cert., Ex. 1, pgs. 7–8, A–19 through A–22; Ex. 10, A–19 through A–22.)

Generally, the RTP in this litigation runs from the Fall of 1974 to December 31, 1976, during which time LDC allegedly disposed of hazardous waste at the Ewan Property Superfund Site ("Ewan Site") in Shamong Township, Burlington County, and the D'Imperio Property Superfund Site ("D'Imperio Site") in Hamilton Township, Atlantic County. More specifically, the JDG contends that the RTP for the D'Imperio Site runs from October 1974 through December 1976 and that the RTP for the Ewan Site runs from March 1975 through October 1975, while Stepan contends that the RTP for the D'Imperio Site runs from December 1974 through December 1976 with use suspended from May 1975 through October 1975 and that the RTP for the Ewan Site runs from April 1975 through October 1975.

Although it also used other disposal sites during the RTP, LDC admits that it disposed of waste at the Ewan and D'Imperio Sites during the RTP. (Gladstone Cert., Ex. 10, E–1, E–2 and G–1.) The JDG defendants were customers of LDC during the RTP, as was Stepan. (Cert., Exhibit "4", pg. 4.)

*LDC's Waste Disposal Procedures*

LDC obtained waste drums from its customers by hauling trailers to its customers' premises and loading the customers' waste drums onto the trailers. The tractor trailers were operated by truck drivers employed by LDC, who were sometimes accompanied by LDC laborers. (Gladstone Cert., Ex. 1, pgs. 8–10, A–23 & 24 and A–

30; Ex. 10, A–23, A–24 and A–30.) These LDC employees included Earl Emmons, Ed Hook, Lexington Ford, Jim McGroarty, Jim Smith, and Fred Ellsworth. (Gladstone Cert., Ex. 1, pgs. 9–10, A–25 through A–29; Ex. 10, A–25 through A–29.)

Typically, not more than 80 full drums were hauled on a single trailer, though sometimes empty drums were stacked on top of the full drums on the floor of the trailer. (Gladstone Cert., Ex. 8, pg. 12, lines 7–23; Ex. 9, pg. 94, line 23 through pg. 95–18; Ex. 10, B–3 and B–4.)

When a pickup of waste drums was made at the premises of a waste drum customer, the trailer would typically be returned to the LDC yard. (Gladstone Cert., Ex. 10, B–6.) Sometimes drums were removed from the trailer and consolidated with drums on a different trailer to make a full load for disposal. (Gladstone Cert., Ex. 10, B–12.) This was accomplished by LDC employees, who stacked the drums in the LDC yard. (Gladstone Cert., Ex. 1, pg. 10, A–31 and A–32.) On other occasions, trailers were taken from the LDC yard to a disposal location without consolidating the drums onto other trailers. (Gladstone Cert., Ex. 8, pg. 14, lines 10–24.) Trailer loads of waste drums generally remained in the LDC yard from between one day and two weeks, although they would rarely remain at the yard longer than a week. (Gladstone Cert., Ex. 2, pg. 251, lines 3–5; Ex. 1, pg. 13, B–6 and b–7; Ex. 10, B–6 and B–7.) On a few occasions, LDC drivers hauled waste directly from a customer to a disposal location. (Gladstone Cert., Ex. 1, pg. 16, B–16; Ex. 10, B–16.)

Upon arrival at a disposal location, LDC employees had an incentive to save waste drums because LDC utilized such drums in its drum reconditioning business; therefore, LDC employees tried to save drums. (Gladstone Cert., Ex. 1, pg. 18, B–24 and B–25; Ex. 10, B–24 and B–25.) Drums were typically saved by pouring their contents out of the drum and onto the surface of the disposal site. (Gladstone Cert., Ex.

8, pg. 20, line 17 through pg. 21, line 2; Ex. 10, B–17.) On occasion, the contents of waste drums may have caused difficulty in disposal because of their chemical composition or physical state. (Gladstone Cert., Ex. 1, pg. 17, B–22 and B–23.) In such cases, LDC employees sometimes sacrificed entire drums, including their contents. (Gladstone Cert., Ex. 1, pg. 16, B–19; Ex. 10, B–19.) As indicated, numerous drums were sacrificed at the Ewan Site, whereas relatively few were sacrificed at the D'Imperio Site. (Gladstone Cert., Ex. 1, pg. 19, B–28 and B–30.)

Because Mike Lightman was in charge of LDC operations during the RTP, it was most often he who directed the drivers as to what disposal sites should be utilized. (Gladstone Cert., Ex. 2, pg. 237, line 23 through pg. 238, line 10.) In his absence, however, Jerome Lightman determined the disposal location to be used. The choice of a disposal site depended on the availability and accessibility of the sites being utilized, as well as the nature of the waste. (Gladstone Cert., Ex. 2, pg. 238, line 22 through pg. 240, line 11; Ex. 10, B–14.) Though landfill sites were licensed by the State of New Jersey during the RTP, neither the D'Imperio Site nor the Ewan Site was licensed. (Gladstone Cert., Ex. 2, pg. 248, lines 20–24.) There is no evidence that any of the LDC customers were aware that LDC was disposing of waste at unlicensed landfills. In fact, Jerome Lightman specifically denies advising any LDC customer of that fact. (Gladstone Cert., Ex. 2, pg. 248, line 25 through pg. 249, line 3.)

*Enforcement and Procedural History at the Ewan Site*

The Ewan Site consists of approximately 43 acres of land located approximately two miles south of the Wharton State Forest. Surrounding land use is generally agricultural with single family residential developments. It appears to border both the Pinelands Agricultural and Protection Areas. The Site is within a mile of a downgradient domestic potable water well. (Gladstone Cert., Ex. 13, pg. 1 of "Decision

Summary for Operable Unit One.") The Ewan Site was proposed for inclusion on the National Priorities List ("NPL") in March 1985, and was formally added to the NPL in June 1986. (*Id.* at pg. 3.)

On June 11, 1990, the United States Environmental Protection Agency ("USEPA") issued an Administrative Order, Index No. II—CERCLA—90114 (amended September 1, 1994) and Administrative Order, Index No. II—CERCLA-95-0107 under Section 106 of CERCLA to numerous potentially responsible parties, including the defendants herein. The Ordered generator parties, including Stepan and the JDG defendants, have been performing the remedy required at the Ewan Site by the OU–1 Record of Decision ("ROD") dated September 29, 1988 and the OU–2 ROD of September 29, 1989, and have thereby incurred response costs. (Gladstone Cert., Ex. 14.) Defendants LDC and Jerome Lightman have not contributed to response costs at the Ewan Site. (*Id.*)

*Enforcement and Procedural History at the D'Imperio Site*

The D'Imperio Site is located at the intersection of U.S. Route 322 (Black Horse Pike) and Cologne Avenue in Hamilton Township, Atlantic County. In the late 1970's, the Atlantic County Public Health Department informed the New Jersey Department of Environmental Protection ("NJDEP") of the existence of the D'Imperio Site. NJDEP performed a preliminary investigation at the Site, and informed the USEPA of the D'Imperio dump site area. (Gladstone Cert., Ex. 15, pg. 6, ¶ 5.) The actual dump area was approximately one and one-half acres in size. In September of 1983, the USEPA listed the D'Imperio Site on the NPL, and thereafter conducted a Remedial Investigation/Feasibility Study ("RI/FS") to delineate the nature, extent, and impact of contamination at the D'Imperio Site. (*Id.*) On March 27, 1985, the USEPA issued a ROD which embodied the USEPA selection of the remedy for the D'Imperio Site. The USEPA undertook to remove the con-

taminated waste, soil, and buried drums from the D'Imperio Site, and in September 1992, it completed the design of the groundwater remediation. (*Id.* at pgs. 7–8.)

On November 4, 1992, the United States filed the Complaint in this matter naming as direct defendants, among others, LDC, Jerome Lightman, Stepan, and certain of the JDG defendants.[2] The Complaint sought reimbursement for past costs for the investigation and removal action which had been undertaken by the USEPA at the D'Imperio Site, and sought a declaration that the defendants were jointly and severally responsible for remediation of the D'Imperio Site. By answer and cross-claims, LDC and Jerome Lightman filed CERCLA § 113 contribution claims against all defendants. All disputes arising out of both the D'Imperio and the Ewan Sites were joined in this litigation by the Honorable Joel B. Rosen, U.S.M.J., by Supplemental Case Management Order No. 4 dated September 13, 1994.

Following issuance of the Administrative Order by the USEPA, Stepan and the other ordered generator parties undertook to perform the remediation pursuant to the Order, and thereby incurred and paid response costs. (Gladstone Cert., Ex. 14.)

## DISCUSSION

### A. *Summary Judgment Standard*

During the pendency of the lawsuit, the USEPA issued Administrative Order, Index No. II–CERCLA–20117 on August 5, 1993. The Order directed LDC, Jerome Lightman, and 11 alleged generators—all of whom are defendants herein—to remediate the D'Imperio Site in accordance with the ROD dated March 27, 1985, and all attachments thereto. (*Id.* at pg. 10.) Stepan was one of the alleged generators ordered to remediate the D'Imperio Site. (*Id.*)

A court may grant summary judgment only when the materials of record "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). An issue is "genuine" if it is supported by evidence upon which a reasonable jury could return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A fact is "material" only if a dispute about it might affect the outcome of the suit under the governing substantive law. *Id.* In deciding whether a genuine issue of material fact exists, the court must view the facts in the light most favorable to the non-moving party and extend all reasonable inferences to that party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

The moving party always bears the initial burden of demonstrating the absence of a genuine issue of material fact, regardless of which party ultimately would have the burden of persuasion at trial. *Celotex,* 477 U.S. at 323, 106 S.Ct. 2548. Once the moving party has met its opening burden, the non-moving party must identify, by affidavits or otherwise, specific facts showing that there is a genuine issue for trial. *Id.* at 324, 106 S.Ct. 2548. The non-moving party may not rest upon the mere allegations or denials of its pleadings. *Id.* "[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id.* at 322, 106 S.Ct. 2548. "When the record is such that it would not support a rational finding that an essential element of the non-mov-

**2.** The JDG direct defendants named in the Complaint are: Aluminum Shapes, Inc.; Colonial Heights Packaging, Inc.; Continental Holdings, Inc.; Croda Inks Corporation; DAP, Inc.; Scott Paper Company; Sonoco Products Company; Union Carbide Corporation; USG Corporation; and USX Corporation.

ing party's claim or defense exists, summary judgment *must* be entered for the moving party." *Turner v. Schering–Plough Corp.*, 901 F.2d 335, 341 (3d Cir. 1990).

### B. *Elements of Liability Under § 113 of CERCLA*

Section 113 of CERCLA provides that any person may seek contribution from any other person who is liable or potentially liable under § 107(a) of CERCLA. 42 U.S.C. § 9613(f)(1). Section 113 "does not in itself create any new liabilities; rather, it confirms the right of a potentially responsible person under section 107 to obtain contribution from other potentially responsible persons." *New Castle County v. Halliburton NUS Corp.*, 111 F.3d 1116, 1122 (3d Cir.1997). The purpose of § 113 is to permit a potentially responsible person "to recoup that portion of its expenditures which exceeds its fair share of the overall liability." *Id.*

█ In order to prevail on a motion for summary judgment to establish another potentially responsible person's several liability for contribution under § 113, the potentially responsible person seeking contribution must prove four elements that establish the defendant's liability under § 107:(1) that the property is a "facility"; (2) that a "release" or "threatened release" of a hazardous substance from the property has occurred; (3) that a release or threatened release has caused the claimant to incur "response costs"; and (4) that the defendant falls within one of the four categories of "responsible parties." *United States v. CDMG Realty Co.*, 96 F.3d 706, 712 (3d Cir.1996)(citing *United States v. Alcan Aluminum Corp.*, 964 F.2d 252, 258–59 (3d Cir.1992)).

### C. *Analysis*

Applying these standards to the record evidence pertaining to each individual member of the JDG Subgroup, the court reaches the following conclusions:

*Scott Paper*

[2] The JDG's allocation expert, The Weinberg Group ("Weinberg"), identifies the following substances as "key constituents" of Scott Paper's waste streams: latex adhesive, acrylic binders, surfactants, catalysts, pigments, defoamers and aluminum sylfamate. (Aronson Certification ("Aronson Cert."), Ex. A, App. B.) Weinberg allocates 1.34% of the liability for response costs at Ewan and 1.05% of the liability for response costs at D'Imperio to Scott Paper. (Aronson Cert., Ex. A, Tables 6 and 7.) Scott Paper has not come forward with any evidence to undermine Weinberg's conclusions with respect to the disposal of its waste at the sites. This evidence alone is sufficient to defeat Scott Paper's motion for summary judgment on Stepan's crossclaim for contribution under § 113 of CERCLA.

*Kiwi*

Weinberg identifies the following substances as "key constituents" of Kiwi's waste streams: water, waste wax (paraffin and Carnauba wax), soap flakes (sodium tallowate), acrylic latex, emulsifiers, dyes (benzidine), mercury, mineral spirits/aliphatic hydrocarbons, aromatic hydrocarbons, alcohols (ethyl, isopropyl, etc.), polymer resins, toluene/ethanol, overfill shoe polish. (Aronson Cert., Ex. A, App. B.) Weinberg allocates 1.38% of the liability for response costs at D'Imperio to Kiwi. (Aronson Cert., Ex. A., Table 7.) Kiwi has not come forward with evidence to undermine Weinberg's assumptions about the disposal of these hazardous substances at the D'Imperio Site. This evidence alone is sufficient to defeat Kiwi's motion for summary judgment on Stepan's third-party claim for contribution under § 113 of CERCLA with respect to the D'Imperio Site.

█ Neither Weinberg nor either of Stepan's experts, James F. Roetzer and M. Alexis Maniatis, attributes any responsibility for response costs at the Ewan Site to Kiwi, but former LDC employee Earl Em-

mons identifies Kiwi as an LDC customer whose waste he disposed of at the Ewan Site during the relevant time period in his February 27, 1990 affidavit. (Mignone Cert., Ex. B.) This evidence is sufficient to create a genuine issue of material fact about whether Kiwi's waste was disposed of at the Ewan Site, precluding summary judgment in .favor of Kiwi on Stepan's third-party claim for contribution under § 113 of CERCLA with respect to the Ewan Site.

### Whiting–Paterson

Weinberg identifies the following substances as "key constituents" of Whiting–Paterson's waste streams: ethyl alcohol and flexographic inks. (Aronson Cert., Ex. A, App. B.) Weinberg allocates 1.26% of liability for response costs at D'Imperio and 1.28% of liability for response costs at Ewan to Whiting–Paterson. (Aronson Cert., Ex. A, Tables 6 and 7.) Whiting–Paterson has not undermined Weinberg's data and assumptions regarding disposal of Whiting–Paterson's hazardous substances at these sites. This evidence alone is sufficient to defeat Whiting–Paterson's motion for summary judgment on Stepan's third-party claim for contribution under § 113 of CERCLA.

### Synthane–Taylor

Weinberg identifies the following substances as "key constituents" of Synthane–Taylor's waste streams: methanol and toluene with phenolic resins in polymer form, MEK and acetone with epoxy resins, toluene with silicone resin, water, and detergent with melamine resins, solid plastic resin particles, phenolics, formaldehyde, dimethyl formamide, glycol ether, dyes (unknown if organic or inorganic). (Aronson Cert., Ex. A, App. B.) Weinberg allocates 1.44% of liability for response costs at. the D'Imperio Site to Synthane–Taylor. (Aronson Cert., Ex. A, Table 7.) Synthane–Taylor has not come forward with any evidence to undermine Weinberg's conclusions about the disposal of its waste at the D'Imperio Site. This evidence alone is sufficient to defeat Synthane–Taylor's motion for summary judgment on Stepan's third-

party claim for contribution under § 113 of CERCLA with respect to the D'Imperio Site.

Neither Weinberg nor either of Stepan's experts attributes any responsibility for response costs at the Ewan Site to Synthane–Taylor, but former LDC employee Earl Emmons identifies Synthane Taylor as an LDC customer whose waste he disposed of at the Ewan Site during the relevant time period in his February 27, 1990 affidavit. (Mignone Cert., Ex. B.) Emmons also indicated in a November 17, 1989 statement that he recalled "a strong chemical smell" emanating from drums of Synthane–Taylor waste he recalled dumping at the Ewan Site. (Mignone Cert., Ex. F.) This evidence, together with evidence of Synthane–Taylor's disposal arrangements with LDC during the relevant time period, is sufficient to create a genuine issue of material fact about whether Synthane–Taylor's waste was disposed of at the Ewan Site, precluding summary judgment in favor of Synthane–Taylor on Stepan's third-party claim for contribution under § 113 of CERCLA with respect to the Ewan Site.

### Wilmington Chemical

Weinberg identifies the following substances as "key constituents" of Wilmington Chemical's waste stream: methyl ethyl ketone, toluene, dimethyl formamide, isocyanates, urethane, epoxy resins. (Aronson Cert., Ex. A, App. B.) Weinberg allocates 1.19% of liability for response costs at the D'Imperio Site to Wilmington Chemical. (Aronson Cert., Ex. A, Table 7.) Wilmington Chemical has not come forward with any evidence to undermine Weinberg's conclusions about the disposal of its waste at the D'Imperio Site. This evidence alone is sufficient to defeat Wilmington Chemical's motion for summary judgment on Stepan's third-party claim for contribution under § 113 of CERCLA with respect to the D'Imperio Site.

There is no record evidence from which a reasonable factfinder could determine that Wilmington Chemical's waste was dis-

posed of at the Ewan Site. Accordingly, the court will grant Wilmington Chemical's motion for summary judgment on Stepan's third-party claim for contribution under § 113 with respect to the Ewan Site.

### Stauffer Chemical

Weinberg identifies the following substances as "key constituents" of Stauffer Chemical's waste streams: resins, ethylene dichloride, PVC resin wastes (halogenated aliphatics and aromatics, acrylates and latex emulsions, plasticizers, resins, elastomers, TCE and other nonpolar solvents, esters, alcohols, inorganic salts, raw materials), all plant products (resins), ethyl acetate, chloroform, acetone, kerosene, xylene, phosphoric acid, methanol, extraction solvents with low levels of process related materials. (Aronson Cert., Ex. A, App. B.) Weinberg allocates 1.62% of liability for response costs at the D'Imperio Site to Stauffer Chemical. (Aronson Cert., Ex. A, Table 7.) Stauffer Chemical has not come forward with any evidence to undermine Weinberg's conclusions about the disposal of its waste at the D'Imperio Site. This evidence alone is sufficient to defeat Stauffer Chemical's motion for summary judgment on Stepan's third-party claim for contribution under § 113 of CERCLA with respect to the D'Imperio Site.

Neither Weinberg nor either of Stepan's experts attributes any responsibility for response costs at the Ewan Site to Stauffer Chemical, but former LDC employee Earl Emmons identifies Stauffer Chemical as an LDC customer whose waste he disposed of at the Ewan Site during the relevant time period in his February 27, 1990 affidavit. (Mignone Cert., Ex. B.) Emmons also indicated in a September 22, 1989 statement that he recalled picking up Stauffer Chemical drums containing "a dark black or brown waste that was very liquid and smelled like fertilizer." (Mignone Cert., Ex. H.) Emmons further stated that he specifically recalls dumping such waste at the Ewan Site on at least one occasion because he remembers thinking at the time that the waste fertilizer "might help the trees." (*Id.*) This evidence, along with evidence that Stauffer Chemical arranged with LDC for the disposal of its waste during the relevant time period, is sufficient to create a genuine issue of material fact about whether Stauffer Chemical's waste was disposed of at the Ewan Site, precluding summary judgment in favor of Stauffer Chemical on Stepan's third-party claim for contribution under § 113 of CERCLA with respect to the Ewan Site.

### Quaker Chemical/B & W/FMC

Weinberg did not perform any analysis of the waste streams of Quaker Chemical, B & W or FMC and did not even consider allocating any response costs to these defendants at either the Ewan or D'Imperio Sites. Similarly, neither of Stepan's experts considered allocating any response costs to these defendants at either of the sites. Indeed, the court is not aware of any record evidence from which a reasonable factfinder could determine that waste generated by Quaker Chemical, B & W or FMC was disposed of at the D'Imperio Site. Accordingly, the court will grant summary judgment to these three defendants on Stepan's third-party claims for contribution under § 113 of CERCLA with respect to the D'Imperio Site.

There is evidence that waste generated by Quaker Chemical, B & W and FMC was disposed of at the Ewan Site. In his February 27, 1990 affidavit, former LDC employee Earl Emmons identifies B & W and FMC as LDC customers whose waste he disposed of at the Ewan Site during the relevant time period, and he identified Quaker Chemical as a company whose waste he was "likely" to have disposed of at the Ewan Site. (Mignone Cert., Ex. B.) In a November 17, 1989 statement, Emmons indicates that he recalls picking up drums that "had a hazardous substance warning triangle on them" from Quaker Chemical's facility in Conshohocken, Pennsylvania, and that it is "likely" that he dumped this waste at the Ewan Site. (Mignone Cert., Ex. D.) In a September 22, 1989 statement, Emmons indicates that he

recalls picking up drums that "appeared to contain paint waste" from a facility in Delair, New Jersey now occupied by Devoe Coatings Company, a division of The Grow Group, Inc., and that it is "likely" that he dumped this waste at the Ewan Site. (Mignone Cert., Ex. J.) In a November 16, 1989 statement, Emmons indicates that he recalls picking up "distinctively colored drums" of "red with a white band" from FMC's facility in Downingtown, Pennsylvania and that it is "likely" that he dumped this waste at the Ewan Site. (Mignone Cert., Ex. C.) However, this speculation by Emmons, unaccompanied by any evidence analyzing the contents of the Quaker Chemical, B & W or FMC waste streams, is insufficient to permit a reasonable factfinder to conclude that these materials were indeed hazardous substances.

Based on this evidence, although a reasonable factfinder could determine that waste generated by Quaker Chemical, B & W and FMC was disposed of at the Ewan Site, there is no record evidence from which a reasonable factfinder could determine that such waste contained hazardous substances, as required under § 107(a) of CERCLA. Accordingly, the court will grant summary judgment to these three defendants on Stepan's third-party claims for contribution under § 113 of CERCLA with respect to both the D'Imperio Site and the Ewan Site.

## CONCLUSION

For the reasons set forth above, the court grants in part and denies in part the JDG Subgroup's motion for summary judgment dismissing Stepan's crossclaims and third-party claims for contribution under § 113 of CERCLA. Specifically, the court grants summary judgment in favor of Wilmington Chemical with respect to the Ewan Site only and in favor of Quaker Chemical, B & W and FMC with respect to both the Ewan and D'Imperio Sites. The court denies the JDG Subgroup's mo-

tion for summary judgment in all other respects.